

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-30-1999

# McCandless v. Vaughn

Precedential or Non-Precedential:

Docket 97-1585

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"McCandless v. Vaughn" (1999). *1999 Decisions.* Paper 86.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/86

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed March 30, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 97-1585

THOMAS MCCANDLESS,
Appellant

v.

DONALD T. VAUGHN; THE ATTORNEY GENERAL OF THE
STATE OF PENNSYLVANIA; DISTRICT ATTORNEY FOR
PHILADELPHIA COUNTY

On Appeal From the United States District Court
For the Eastern District of Pennsylvania
(D.C. Civil Action No. 96-cv-02310)
District Judge: Hon. Herbert J. Hutton

Argued September 18, 1998

BEFORE: STAPLETON and ROTH, Circuit Judges, and
HOEVELER,* District Judge

(Opinion Filed March 30, 1999)

Peter Goldberger (Argued)
Pamela A. Wilk
Law Office of Peter Goldberger
50 Rittenhouse Place
Ardmore, PA 19003-2276
 Attorneys for Appellant

_____

*Honorable William M. Hoeveler, Senior United States District Judge for
the Southern District of Florida, sitting by designation.

Donna G. Zucker (Argued)
Chief, Federal Litigation
Ronald Eisenberg
Deputy District Attorney,
 Law Division
Arnold H. Gordon
1st Assistant District Attorney
Lynne Abraham
District Attorney
1421 Arch Street
Philadelphia, PA 19102-1582
 Attorneys for Appellees

OPINION OF THE COURT

STAPLETON, Circuit Judge:

Thomas McCandless appeals the District Court's denial of his habeas corpus application under 28 U.S.C. S 2254, alleging that his conviction for murder and related charges in a Pennsylvania Court of Common Pleas violated his federal constitutional and statutory rights. McCandless's appeal presents four claims for habeas relief. First, he contends that admission of a prosecution witness' double hearsay testimony violated his Sixth Amendment right to confrontation. Second, he argues that a District Attorney's Office official's testimony regarding the "corroboration" condition of the cooperation agreement between that office and the prosecution's key witness amounted to improper prosecutorial vouching and deprived him of due process. Third, McCandless contends that the trial court lacked jurisdiction to try him because Pennsylvania extradited him from New Jersey in violation of the Interstate Agreement on Detainers Act. Fourth, McCandless claims that admission of the prosecution's key witness' preliminary hearing testimony violated his Sixth Amendment right to confrontation.

We conclude that McCandless's first two claims are procedurally defaulted and that his third is without merit. However, because we conclude that the prosecution did not

2

fulfill its duty to protect McCandless's constitutional right to confront the key witness against him, we will reverse.

I.

On August 11, 1980, Philadelphia police arrived at a crime scene where Theodore Stebelski had been shot to death. An eyewitness at the scene, William Hopkins, told police that he had heard gunshots coming from a garage rented by McCandless located at 2206 East Fletcher Street in Philadelphia. According to Hopkins, after the gunshots, Stebelski crashed through the garage door, collapsed on the sidewalk, picked himself up, and ran around the corner finding refuge against a blue Buick parked nearby. Hopkins then observed another man, later identified as John Barth, running from the garage. Barth quickly returned to the garage to assist another man in removing the collapsed garage door from a blue Chevrolet. The other man sped away in the Chevrolet once it was freed. McCandless owned a 1955 Chevrolet similar to the one Hopkins observed. Barth then ran to the blue Buick where the bleeding Stebelski lay, grabbed Stebelski by the neck and shook him. After Hopkins intervened, Barth sped away in the Buick. Police and a medical rescue unit soon arrived. Despite the rescue unit's efforts, however, Stebelski died of two gunshot wounds to the shoulder and trunk of his body.

Police arrested Barth for the Stebelski murder. After negotiations with the District Attorney's office, Barth agreed to serve as a cooperating witness and gave a statement implicating McCandless and Patrick Hartey in the murder. In return, prosecutors promised that, if Barth's information was corroborated by investigators, they would (i) facilitate his release on bail, and (ii) at the successful conclusion of the case, drop the charges against him.

On September 15, 1981, the Commonwealth filed criminal complaints charging McCandless and Hartey with Stebelski's murder and issued warrants for their arrest. At the time, however, McCandless and Hartey were both incarcerated in New Jersey on unrelated offenses. Accordingly, Pennsylvania began extradition proceedings under the Interstate Agreement on Detainers Act ("IAD").

See 42 Pa. Cons. Stat. Ann. S 19101. McCandless's extradition was sought on the basis of theft and drug offenses unrelated to the Stebelski murder. Despite McCandless's resistance, he was extradited on February 17, 1982.

The Commonwealth prosecuted McCandless and Hartey jointly for the Stebelski murder. At a preliminary hearing, Barth, the only eyewitness to the shooting inside the garage, testified about the murder. Barth stated that McCandless had "pistol whipped" and shot Stebelski in the back as he fled. After the hearing, Barth disappeared and did not testify at McCandless's trial. Barth's preliminary hearing testimony, however, was admitted at trial.

The trial judge made three significant evidentiary decisions which form the basis of three of McCandless's four claims for habeas relief. First, the court determined that Barth was "unavailable" and allowed Barth's preliminary hearing testimony to be read to the jury. Second, the court allowed Joseph Murray, chief of the Homicide Unit of the District Attorney's Office, to testify regarding the terms of Barth's cooperation agreement, including two statements regarding the agreement's "corroboration" condition. Third, the court admitted alleged double hearsay testimony by Stebelski's friend, David Antovich, who had driven Stebelski to McCandless's garage on the day of the crime. Antovich testified that, while he was waiting for Stebelski, an unidentified man told him that "Tommy said to take a ride and come back infive minutes." McCandless's first name is Thomas.

On August 20, 1982, the jury found McCandless guilty of first degree murder, criminal conspiracy and possession of an instrument of crime. The court sentenced McCandless to mandatory life imprisonment on the murder count and an aggregate consecutive prison term of seven and one half to fifteen years on the other charges.

McCandless appealed his conviction to the Pennsylvania Superior Court raising approximately thirty claims of error. The Superior Court affirmed the murder and conspiracy convictions, but vacated the possession conviction. Commonwealth v. McCandless, 512 A.2d 52 (Pa. Super. Ct.

4

1986)(table). McCandless then filed an application for permission to appeal to the Pennsylvania Supreme Court. The application abandoned the majority of McCandless's Superior Court claims and listed only four grounds for relief. The Pennsylvania Supreme Court denied the application for discretionary review. See Commonwealth v. McCandless, 522 A.2d 557 (Pa. 1987)(table).

Nine years later, on March 21, 1996, McCandlessfiled a petition for habeas corpus relief in the District Court. The District Court rejected all thirteen claims presented in his petition. As we have noted, McCandless appeals the District Court's resolution of only four of these claims. This court granted McCandless's application for a certificate of probable cause and we have jurisdiction under 28 U.S.C. S 2253. AEDPA's habeas corpus amendments do not apply to this case because McCandless's application was filed prior to, and was pending on, AEDPA's effective date. See Lindh v. Murphy, 117 S.Ct. 2059 (1997); United States v. Skandier, 125 F.3d 178 (3d Cir. 1997).

"Because the District Court relied entirely upon the state court record and did not hold an evidentiary hearing, our review [of the District Court's decision] is plenary." Hassine v. Zimmerman, 160 F.3d 941, 947 (3d Cir. 1998)(citing Johnson v. Rosemeyer, 117 F.3d 104, 109 (3d Cir. 1997). Like the District Court, we must presume all state court factual findings to be correct, 28 U.S.C. S 2254(d), but we "exercise plenary review over state court conclusions on mixed questions of law and fact and pure issues of law." Hassine, 160 F.3d at 947; see Miller v. Fenton, 474 U.S. 104, 105 (1985)(holding that while "subsidiary factual questions" are subject to S 2254(d)'s presumption, the ultimate legal question of confession's constitutional voluntariness "is a matter for independent federal determination"); Sumner v. Mata, 455 U.S. 591, 597 (1982)(ultimate question of pretrial identification procedure's constitutionality presented "mixed question of law and fact that is not governed by S 2254(d)"); Daniel v. Warden, State Correction Inst. at Huntingdon, Pa., 794 F.2d 880, 883 (3d Cir. 1986) (S 2254(d) factual presumption does not apply to ultimate legal question of whether constitutional right against double jeopardy was violated).

II.

Federal courts have the power to entertain habeas corpus applications by persons in state custody claiming that they "[are] in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. S 2254(a). As a general rule, federal courts may exercise the power to consider habeas applications only where "it appears that the applicant has exhausted the remedies available in the courts of the State." Walker v. Vaughn, 53 F.3d 609, 614 (3d Cir. 1995)(quoting 28 U.S.C. S 2254(b)). The exhaustion rule requires applicants to "fairly present" federal claims to state courts before bringing them in federal court. See Duncan v. Henry, 513 U.S. 364, 365 (1995); Picard v. Connor, 404 U.S. 270, 275 (1971); Lambert v. Blackwell, 134 F.3d 506, 513 (3d Cir. 1998). When a claim is not exhausted because it has not been "fairly presented" to the state courts, but state procedural rules bar the applicant from seeking further relief in state courts, the exhaustion requirement is satisfied because there is "an absence of available State corrective process." 28 U.S.C.S 2254(b). In such cases, however, applicants are considered to have procedurally defaulted their claims and federal courts may not consider the merits of such claims unless the applicant establishes "cause and prejudice" or a "fundamental miscarriage of justice" to excuse his or her default. See Coleman v. Thompson, 501 U.S. 722, 750 (1991).

The parties agree that McCandless is procedurally barred from asserting his claims in the Pennsylvania state courts. Thus, any claim not already fairly presented to Pennsylvania's courts would be procedurally defaulted. Accordingly, we may only consider the merits of McCandless's habeas claims in either of two circumstances. First, we may consider any exhausted claim that McCandless "fairly presented" to Pennsylvania's courts. Second, even if we conclude that McCandless did not"fairly present" a particular claim, we may still consider its merits if McCandless excuses his procedural default by demonstrating "cause and prejudice" or a "miscarriage of justice."

The District Court determined that McCandless had not

6

fairly presented his double hearsay and prosecutorial vouching claims to the state courts.1 We agree.

To "fairly present" a claim, a petitioner must present a federal claim's factual and legal substance to the state courts in a manner that puts them on notice that a federal claim is being asserted. See Anderson v. Harless, 459 U.S. 4, 6 (1982); Picard v. Connor, 404 U.S. 270, 277-78 (1971). It is not sufficient that a "somewhat similar state-law claim was made." Harless, 459 U.S. at 6. Yet, the petitioner need not have cited "book and verse" of the federal constitution. Picard, 404 U.S. at 277.

The Supreme Court most recently applied these principles in Duncan v. Henry, 513 U.S. 364 (1995). There, the habeas applicant had been convicted in state court for sexual molestation. The trial court admitted testimony by the parent of a child who claimed to have been molested by the applicant 20 years earlier. The applicant's state appeal claimed that the trial court erred in admitting the parent's testimony without making any reference to federal law. The state courts analyzed and rejected the claim under California constitutional and evidence law. The applicant then filed a federal habeas corpus application claiming the evidentiary error deprived him of his constitutional due process rights. The Ninth Circuit held that the applicant had "fairly presented" his federal claim to the state courts because "it is not necessary to invoke `the talismanic phrase "due process of law' " or cite the `book and verse on the federal constitution' " to notify state courts of federal claims. Id. at 366 (citing Henry v. Estelle, 33 F.3d 1037 (9th Cir. 1994)). The Supreme Court reversed, holding that the federal claim had not been fairly presented to the state courts.

We read Duncan as reaffirming the teaching of Harless and Picard that the absence of explicit reference to federal law does not resolve the issue of whether a federal claim

_____

1. The District Court determined that McCandless had "fairly presented" his IAD claim and his claim that admitting Barth's preliminary hearing testimony violated the Confrontation Clause. Our review of the record confirms the District Court's conclusion. Accordingly, we consider the merits of these claims infra in section III of this opinion.

was fairly presented. It also reaffirms, however, that petitioners must have communicated to the state courts in some way that they were asserting a claim predicated on federal law. As the Court explained:

> [E]xhaustion of state remedies requires that petitioners `fairly presen[t]' federal claims to the state courts in order to give the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights. If state courts are to be given the opportunity to correct alleged violations of prisoners' federal rights, they must surely be alerted to the fact that the prisoners are asserting claims under the United States Constitution. If a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court.

Id. at 365-66 (citations and quotations omitted).

In Evans v. Court of Common Pleas, De. County, Pa., 959 F.2d 1227 (3d Cir 1992), we noted some of the ways in which petitioners may communicate that they are asserting a federal claim without explicitly referencing specific portions of the federal constitution or statutes. Quoting from Daye v. Attorney General of New York, 696 F.2d 186 (2d Cir. 1982) (en banc), we observed that the required message can be conveyed through "(a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation." Evans, 959 F.2d at 1232. As in Duncan, however, the petitioner here did not, by these means or any other, serve fair notice that he was asserting either of his due process claims.

McCandless's "double hearsay" claim in state court made no reference to a constitutional or federal right and cited only state cases considering state evidence law without employing any constitutional analysis.2  McCandless's

---

2. The Court of Common Pleas opinion cited one case, Commonwealth v. Darden, 457 A.2d 549 (Pa. 1983), involving a pure matter of state

Pennsylvania Superior and Supreme Court briefs do not assert this claim in "terms so particular as to bring to mind" a constitutional right, nor do they "allege a pattern of facts well within the mainstream of constitutional litigation." To the contrary, this "double hearsay" claim brings to mind a classic evidence issue which is precisely how it was understood by the state courts.

Similarly, McCandless presented his "prosecutorial vouching" claim to Pennsylvania's courts as an evidentiary law challenge and not as a violation of a federal or constitutional right. He did not assert this claim in terms that bring to mind a constitutional right. On the contrary, his Superior and Pennsylvania Supreme Court briefs articulated this claim in terms similar to a Rule 403 objection, contending that the cooperation agreement testimony was "irrelevant" and "prejudicial" and therefore improperly admitted. Nowhere are the terms "constitution", "due process" or even "fair trial" mentioned. The cases cited were predominantly state cases that considered state evidence law issues and did not employ constitutional analysis.3 Finally, we note that there is no similarity in the

_____

evidence law. The Superior Court affirmed without citing authority. McCandless's Superior Court brief confined its argument to state evidence law and cited Commonwealth v. Floyd, 476 A.2d 414 (Pa. Super. Ct. 1984), Commonwealth v. Cruz, 414 A.2d 1032 (Pa. 1980), Commonwealth v. Scott, 470 A.2d 91 (Pa. 1983), Commonwealth v. Little, 364 A.2d 915 (Pa. 1976), Commonwealth v. Cimorose, 478 A.2d 1318 (Pa. Super. Ct. 1984), all state cases involving evidence law issues. McCandless's Pennsylvania Supreme Court brief did not cite any additional authority.

3. The Court of Common Pleas opinion cited Commonwealth v. Reed, 446 A.2d 311 (Pa. Super.Ct. 1982), which dealt with state evidence law and a prosecutor's state law ethical duty to present their case "fairly." It held
that improper vouching was a violation of this duty. Reed did not consider a constitutional claim. McCandless's Superior Court brief also cited Reed and additionally Commonwealth v. Cygan, 243 A.2d 476 (Pa. Super. Ct. 1968), which dealt with state evidence law. The Superior Court affirmed without discussion. McCandless's Pennsylvania Supreme Court brief cited Floyd, Cygan, Cruz, and Reed and additionally Commonwealth v. Tann, 459 A.2d 322, (Pa. 1983); none employed

9

analysis applicable to these two claims. In state court, resolution required a determination of relevancy and a balancing of possible prejudicial effect. McCandless's claim that the same facts amounted to prosecutorial vouching in violation of due process involves an inquiry as to whether the prosecutorial misconduct undermined the fundamental fairness of the entire trial. See Darden v. Wainwright, 477 U.S. 168, 183 (1986); Ramseur v. Beyer, 983 F.2d 1215, 1239 (3d Cir. 1992)(en banc). Accordingly, here, as in Duncan, the state courts "analyzed the evidentiary error by asking whether its prejudicial effect outweighed its probative value, not whether it was so inflammatory as to prevent a fair trial." Duncan, 513 U.S. at 366.

Thus, we conclude that McCandless did not fairly present his double hearsay and prosecutorial vouching claims to Pennsylvania's courts. Because McCandless is procedurally barred from asserting these claims in state court, his claims are considered exhausted due to procedural default. We may only consider these claims if McCandless excuses his default by showing "cause and prejudice" or a "miscarriage of justice." See Coleman, 501 U.S. at 750. McCandless, however, makes no attempt to show either. Accordingly, we are not free to consider them on their merits.

III.

McCandless fairly presented Pennsylvania's courts with his IAD claim and his claim that admission of Barth's preliminary hearing testimony violated the Confrontation Clause. We now consider the merits of these claims.

_____

constitutional analysis. In Tann, the Pennsylvania Supreme Court granted a new trial based upon ineffectiveness of defense counsel for failing to object to highly prejudicial and irrelevant prosecutorial bolstering. While McCandless's state court briefs cited two federal cases considering claims of prosecutorial vouching, these cases did not reach constitutional issues for the propositions for which they are cited. See United States v. Winter, 663 F.2d 1120 (1st Cir. 1981) and United States v. Roberts, 618 F.2d 530 (9th Cir. 1980).

10

A.

The IAD "is a compact which has been adopted by 48 states, the District of Columbia, and the United States, to encourage expeditious and orderly disposition of outstanding criminal charges filed against a person incarcerated in a different jurisdiction." Cooney v. Fulcomer, 886 F.2d 41, 43 (3d Cir. 1989). IAD violations are cognizable in federal habeas corpus because the IAD is a "law of the United States" for purposes of 28 U.S.C. S 2254. See Reed v. Farley, 512 U.S. 339, 347 (1994)("While the IAD is indeed state law, it is a law of the United States as well."); Cooney, 886 F.2d at 43 n.1 ("The IAD [was] . . . approved by Congress pursuant to the Compact Clause [and] . . . is a federal law . . . . Thus, the federal courts have habeas corpus jurisdiction . . .").

The IAD establishes procedures for the transfer of prisoners to face criminal prosecution in another state. Article V(d) provides:

> The temporary custody referred to in this agreement shall be only for the purpose of permitting prosecution on the charge or charges contained in one or more untried indictments, informations, or complaints which form the basis of the detainer or detainers or prosecution on any other charge or charges arising out of the same transaction. . . .

42 Pa. Cons. Stat. Ann. S 9101.

The parties agree that (i) McCandless was incarcerated in New Jersey when Pennsylvania filed murder charges against him; (ii) Pennsylvania filed its IAD request based upon charges wholly unrelated to the Stebelski murder; and (iii) Pennsylvania prosecuted McCandless on the murder charge when they gained custody under their IAD request. The parties also agree that this clearly violated Article V(d). They disagree, however, on whether this IAD violation warrants habeas relief. We conclude that our decision in Cooney v. Fulcomer, 886 F.2d 41 (3d Cir. 1989), is controlling here and that habeas relief must be denied.

In Cooney, Pennsylvania obtained custody of the habeas applicant from New Jersey through an IAD request based

11

upon burglary charges. The state then (i) dismissed the burglary charges, (ii) filed new robbery charges based upon wholly unrelated events, and (iii) convicted the applicant on the robbery charges. See id. at 42. The applicant then sought federal habeas corpus relief based upon Pennsylvania's violation of IAD Article V(d). See id. at 43. We concluded that Pennsylvania had blatantly violated Article V(d), but nonetheless held that the applicant was not entitled to habeas relief because violation of Article V(d) "was not so fundamental as to warrant habeas relief." Id. at 42.4

McCandless attempts to distinguish Cooney by arguing that there the applicant alleged that Pennsylvania's violation of Article V(d) deprived him of his "procedural" right to contest his transfer before the sending state's Governor by knowing the charges upon which his transfer was based. By contrast, McCandless contends that he is asserting a "substantive" claim that Article V(d) deprived the Court of Common Pleas of jurisdiction—both personal and subject matter—to try him for the crimes. He argues this is "fundamental" rather than merely procedural. We find this argument unavailing.

The Court of Common Pleas did not depend upon the IAD for personal or subject matter jurisdiction. Both are independently provided by other Pennsylvania statutes. Under 42 Pa. Cons. Stat. Ann. S 931, the Court of Common Pleas has "unlimited original jurisdiction of all actions and proceedings . . . cognizable by law" except where original jurisdiction has been delegated to another court in Pennsylvania's unified court system. The murder and related charges fall within this category. See Commonwealth

_____

4. We have found violations of other IAD provisions insufficiently "fundamental" to warrant habeas relief. See Casper v. Ryan, 822 F.2d 1283 (3d Cir. 1987) (violation of article III's requirement of trial within 180 days of request by detainee not "fundamental defect" warranting habeas relief); Shack v. Attorney Gen. of Pa., 776 F.2d 1170, 1173-74 (3d Cir. 1985)(violation of article IV(a)'s pre-transfer hearing provision not sufficient to allow "the extraordinary sanction of a collateral attack on an otherwise valid criminal conviction"); but see United States v. Williams, 615 F.2d 585 (3d Cir. 1980)(violation of article IV(e)'s antishuttling provision "fundamental" enough to warrant habeas relief).

12

v. Matlock, 393 A.2d 26, 28 (Pa. 1978)("The court of common pleas has jurisdiction to hear murder cases."). The Court of Common Pleas' personal jurisdiction is provided by 42 Pa. Cons. Stat. Ann. S 5301(a)(1), which inter alia provides personal jurisdiction over individuals who are present or domiciled in the Commonwealth when process is served. McCandless was present in Pennsylvania when he was arrested for the murder charges. Personal jurisdiction does not depend upon how McCandless came to be present in Pennsylvania. Indeed, as the District Court noted, under Supreme Court precedent the Court of Common Pleas might even have had jurisdiction if McCandless had been brought into Pennsylvania by forcible abduction. Frisbee v. Collins, 342 U.S. 519, 522 (1952).5  In short, we conclude that we are bound by our holding in Cooney that violations of IAD Article V(d) are not fundamental enough to warrant habeas relief.

B.

We now turn to McCandless's claim that admission of Barth's preliminary hearing testimony violated his rights under the Confrontation Clause. The Sixth Amendment guarantees criminal defendants "the right to be confronted with the witnesses against [them]." U.S. Const. amend. 6. Read literally, this clause "would require, on objection, the exclusion of any statement made by a declarant not present at trial." Ohio v. Roberts, 448 U.S. 56, 62 (1980). The

_____

5. McCandless also argues that the Supreme Court's decisions in United States v. Rauscher, 119 U.S. 407 (1886) and Johnson v. Browne, 205 U.S. 309 (1907), regarding the "rule of specialty" in international extradition law, apply to this case. We find this argument unpersuasive. In Rauscher, the Court interpreted an extradition treaty between the United States and Great Britain as impliedly requiring that individuals extradited under the treaty are tried only for the specific offenses upon which extradition was sought. 119 U.S. 407. The Browne Court reaffirmed this rule of international law in a habeas corpus proceeding. 205 U.S. 309. These cases did not arise under a domestic statute with its own controlling jurisprudence. Moreover, the Supreme Court has specifically held that the international law "rule of speciality" does not apply to domestic extraditions under the Extradition Clause. Lascelles v. Georgia, 148 U.S. 537, 542-43 (1893).

13

Supreme Court, however, has interpreted the clause to allow admission of non-testifying declarants' out of court statements where the prosecution establishes that (i) the declarant is "unavailable" and (ii) the statement bears adequate "indicia of reliability." Id. at 65-6.

When prosecutors seek to admit a non-testifying witness' preliminary hearing testimony the Confrontation Clause requires two things. First, the prosecution must establish that the declarant is "unavailable" by showing that "prosecutorial authorities have made a good-faith effort to obtain [the declarant's] presence at trial." Id. at 74; see also United States v. Steele, 685 F.2d 793, 808 (3d Cir. 1982)("The Confrontation Clause of the sixth amendment permits [admission of depositions in criminal trials] when the witness is unavailable despite good-faith efforts undertaken prior to trial to locate and present that witness."). Judging whether a "good faith" effort has been made is "a question of reasonableness," and"the prosecution bears the burden of establishing this predicate." Roberts, 448 U.S. at 74-5 (quoting California v. Green, 399 U.S. 149, 189 n.22 (1970)). Second, to satisfy the "indicia of reliability" requirement, the prosecution must demonstrate that the defendant had an adequate opportunity to cross-examine the declarant at the preliminary hearing. See id. at 73.

McCandless claims that neither of these constitutional prerequisites were satisfied for the admission of Barth's preliminary hearing testimony. We find it necessary to address only the issue of whether Barth was constitutionally unavailable.6

_____

6. Because we find a Confrontation Clause violation based upon the prosecution's failure to establish Barth's unavailability, we find it unnecessary to address McCandless's additional claim that admission of Barth's testimony violated the Confrontation Clause because he did not have an adequate opportunity to cross-examine Barth at the preliminary hearing. In his brief, McCandless conceded that he did not present this claim to the Pennsylvania Supreme Court and that it is procedurally defaulted. He attempted, however, to excuse this default on the ground that his counsel had been ineffective in failing to raise this claim in his
allocatur petition to the Pennsylvania Supreme Court. Because the same

14

As noted, we must presume all state court factual findings to be correct in our analysis of McCandless's Confrontation Clause claim. 28 U.S.C. S 2254(d). "[W]hile the presumption of correctness applies to the basic, primary or historical facts, the ultimate issue of unavailability for purposes of the Confrontation Clause is a mixed question of fact and law, reviewable de novo." Martinez v. Sullivan, 881 F.2d 921, 926 (10th Cir. 1989); see Burns v. Clusen, 798 F.2d 931, 941-42 (7th Cir. 1986); Dres v. Campoy, 784 F.2d 996, 998 (9th Cir. 1986)("[W]e review de novo the question of whether the Supreme Court's standards for unavailability have been satisfied in this case."); see also Thomas v. Gunter, 962 F.2d 1477, 1483 (10th Cir. 1992)(whether hearsay statements met Confrontation Clause's indicia of reliability requirement presents "a mixed question of law and fact we review de novo").

The prosecution's Sixth Amendment duty requires it to undertake reasonable "good faith" efforts to locate witnesses before a court will admit a non-testifying witness' preliminary hearing testimony. See Roberts, 448 U.S. at 74-75. The Supreme Court has noted that in fulfilling this duty:

> The law does not require the doing of a futile act. Thus, if no possibility of procuring the witness exists (as for

_____

counsel had included this argument in McCandless's Superior Court brief, the District Court concluded that the failure to reassert it was a strategic decision and not ineffective assistance of counsel.

In rebuttal at oral argument, McCandless alternatively argued that he had indeed "fairly presented" this claim because he had included it in his only state appeal as a matter of right to the Superior Court. McCandless requested this Court to consider whether "exhaustion" requires an applicant to present claims in state discretionary appeals. We are not free to do so. This Court's precedents indicate that habeas petitioners must present their federal claims to the state's highest court.
See Evans, 959 F.2d at 1230 ("A claim must be presented not only to the trial court but also to the state's intermediate court as well as to its supreme court."); Caswell v. Ryan, 953 F.2d 853, 861 (3d Cir. 1992); Beaty v. Patton, 700 F.2d 110, 111 (3d Cir. 1983). But see Boerckel v. O'Sullivan, 135 F.3d 1194 (7th Cir.) cert. granted, 119 S. Ct. 508 (1998).

15

example the witness' intervening death), "good faith" demands nothing of the prosecution. But if there is a possibility, albeit remote, that affirmative measures might produce the declarant, the obligation of good faith may demand their effectuation. The lengths to which the prosecution must go to produce a witness . . . is a question of reasonableness.

Id. at 74 (emphasis added).

The reasonableness of the prosecution's efforts must be evaluated with a sensitivity to the surrounding circumstances and the defendant's interest in confronting the absent witness. Confrontation Clause concerns are heightened and courts insist on more diligent efforts by the prosecution where a "key" or "crucial" witness' testimony is involved. See United States v. Foster, 986 F.2d 541, 543 (D.C. Cir. 1993) ("The more important the witness to the government's case, the more important the defendant's right, derived from the Confrontation Clause of the Sixth Amendment"); United States v. Lynch, 499 F.2d 1011, 1022 (D.C. Cir. 1974) ("Confrontation Clause considerations `are especially cogent when the testimony of a witness is critical to the prosecution's case against the defendant.' "); United States v. A&S Council Oil Co., 947 F.2d 1128, 1133 (4th Cir. 1991) ("Where [a case] involves the government's most crucial witness, the [Confrontation Clause] concerns are especially heightened."); United States v. Quinn, 901 F.2d 522, 529 (6th Cir. 1990) (same); Dorsey v. Parke, 872 F.2d 163, 166 (6th Cir. 1989) ("Where the trial court has curtailed a defendant's cross-examination of a `star' government witness--as it has done in this case--its ruling must be more carefully scrutinized."); cf. Davis v. Alaska, 415 U.S. 308 (1974) (repeatedly emphasizing cross-examination of "key" and "crucial" witness as significant factor for determining that defendant's confrontation rights outweighed key witness' privacy interest in non-disclosure of juvenile record under state law).

The defendant's interest in confrontation is, of course, further heightened where the absent witness has special reason to give testimony favorable to the prosecution. Confrontation Clause protections are " `especially important with respect to accomplices or other witnesses who may

16

have substantial reason to cooperate with the government.' " United States v. Mayans, 17 F.3d 1174, 1184 (9th Cir. 1994) (quoting United States v. Onori , 535 F.2d 938, 945 (5th Cir.1976)); see United States v. Greenberg, 423 F.2d 1106 (5th Cir. 1970) (curtailing cross-examination of cooperating co-defendant witness regarding witness' plea arrangement with prosecution violated Confrontation Clause).

Finally, special sensitivity to Confrontation Clause concerns is appropriate where the consequences of a conviction based on the absent witness' testimony are grave. In a capital case, for example, it is fair to ask more of the prosecution than in a situation involving significantly less serious consequences.

In this case, McCandless's interest in confrontation with Barth could not have been higher. He was charged with an offense which carried a mandatory life sentence, and the prosecution was seeking the death penalty. Barth was the prosecution's only eye witness to the alleged shooting, and his testimony was the only substantial evidence implicating McCandless in the murder. These factors would have made full cross examination before the jury of crucial importance to McCandless even if Barth had been a wholly impartial witness. But he was not. He had been charged with and arrested for the same homicide and had reached an agreement with the prosecution that he would go free if he testified against McCandless and Hartey and they were convicted. With McCandless's acute Sixth Amendment interest in confronting Barth in mind, we turn to the evidence pertaining to the government's efforts to secure Barth's presence at trial.

Barth was arrested and charged with Stebelski's death in March of 1981. He agreed to cooperate with the government and gave a written statement implicating McCandless in September of 1981, a little over a year after the alleged crime. The prosecution agreed to support a reduction of Barth's bail as part of the cooperation agreement. Barth was released on bail and his father, Edward Barth, became the surety on his bond. Barth was required to report every other week to a designated room in the courthouse where he was to sign a subpoena. In February, 1982, Barth failed

17

to report to the designated room and failed to appear at a preliminary hearing regarding an unrelated weapons charge, which resulted in the issuance of a bench warrant for his arrest. Barth was arrested and released. In April, 1982, Barth again failed to appear in court, this time at a preliminary hearing in McCandless's case. Another bench warrant was issued and police arrested Barth at his home. Barth was temporarily incarcerated at Holmsberg prison, but was released on the same bail conditions after testifying at McCandless's preliminary hearing. Approximately one month later, in early May, 1982, Barth again failed to report and yet another bench warrant was issued for his arrest on May 14th. This time, however, police were unable to find Barth before the McCandless trial commenced on August 9, 1982.

Four witnesses testified regarding the Commonwealth's efforts to locate and secure Barth's presence at trial after he disappeared in early May, 1982. First, Detective Frank O'Brien, the detective assigned to the Stebelski murder, testified that he told other police officers to keep an eye out for Barth and that he personally looked for him when he was in Barth's neighborhood "on other business." O'Brien admitted, however, that he made no effort to locate Barth during the two months prior to McCandless's trial. During the month preceding trial, he was on vacation.

Second, Detective Joseph Guerrera, a detective assigned by the District Attorney's office to locate and serve Barth with a subpoena, testified that he attempted to serve Barth with a subpoena on two occasions in July. First, in early July, he (i) checked police and prison records, (ii) visited the Barth house and slipped a subpoena under the door, and (iii) questioned a grocer and neighborhood youth regarding Barth's whereabouts. Guerrera repeated these efforts on July 27, 1982, less than a week before jury selection commenced on August 2, 1982. This time, he spoke with a neighbor who told him that Mrs. Barth was at the shore and that Barth had been in the neighborhood in June. Guerrera never attempted to contact Barth's father, mother or siblings because he was "more or less used on a one day basis" and his assigned task was to serve Barth and five other witnesses in the case with subpoenas. He assumed

18

that the detective assigned to the murder case, Detective O'Brien, was investigating Barth's whereabouts.

Third, Detective Tyres, a detective assigned to locate Barth one week before trial, testified that he (i) checked police, prison and Department of Public Assistance records, and (ii) went to the Barth residence where he spoke to Mrs. Barth and a man he assumed to be Barth's brother on August 4, 1982. Both claimed to have no knowledge of Barth's whereabouts.

Finally, Joan Burren, a representative from Pretrial Services ("ROR"), read the notations from Barth's ROR file detailing that department's efforts to locate Barth. ROR's activities centered around three dates. First, after the bench warrant was issued in May, the ROR made a series of unsuccessful phone calls to the Barth home to schedule a "walk in" surrender. Mrs. Barth advised that Barth no longer lived there. Second, on July 1, 1982, ROR officers visited the Barth house, found the door open, and searched the home, but found the residence empty. Third, on August 6, 1982, an ROR officer called Mrs. Barth, who reported that she had met Barth two weeks earlier in Dover, Delaware. She gave no further information, but the officer's notation indicated that he believed that she knew Barth's location because the meeting was pre-arranged. Following this conversation, the officer sought to obtain the Barth residence phone records of all calls to and from Delaware. The telephone company representative, however, refused to surrender the information without a warrant. No warrant was sought. An ROR officer also called the Dover police department, which returned the call forty minutes later indicating that they had no record of Barth in Delaware. Finally, a call was made to the Pennsylvania Department of Motor Vehicles.

Burren also testified that ROR knew Barth's parents' identity and address, and that they knew that Barth's father was the surety for Barth's bond. Nonetheless, no effort was made to contact Barth's parents or siblings. No federal warrant was sought.

Thus, the record shows the following. The government supported a bail reduction that allowed Barth to gain his

19

freedom. After two failures to appear, two bench warrants and two rearrests, it sought no alteration in conditions of his bail. In early May of 1982, three months before trial, Barth failed to appear for the third time and a bench warrant was issued. Follow-up calls by Barth's pre-trial services officers established that Barth could not be expected to voluntarily cooperate. As of mid-May, two and a half months prior to trial, it is fair to say that Barth's presence at trial would not be assured unless the prosecution took affirmative action to secure it. Its response to this situation over the next ten weeks can only be described as casual.

These efforts focused around two dates. First, approximately one month before trial in early July, prosecutorial authorities checked Pennsylvania police and prison records and twice unsuccessfully visited the Barth household, once slipping a subpoena under the door. Second, in the week immediately preceding jury selection and trial in early August, authorities repeated these efforts. In the month between these dates prosecutorial authorities were idle. This was perhaps attributable to the fact that the detective assigned to the case was on vacation, and the Assistant District Attorney who tried the case did not receive her assignment until one week before trial. Neither explanation, however, can excuse the consequent infringement of constitutional rights.

Nothing in the record suggests that Mrs. Barth was avoiding authorities, yet officials delayed serious efforts to question her about Barth's whereabouts until August 4th, two days after jury selection commenced. When an ROR officer talked to Mrs. Barth two days later, he learned that she had met Barth in Dover, Delaware just two weeks earlier. Drawing the reasonable inference that the meeting might have been prearranged by telephone, and that other telephone contacts might have taken place, the officer attempted to get the telephone company to voluntarily provide the McCandless residence phone records, but did not expend the minimal effort necessary to follow up with a warrant. Moreover, despite the officer's notation that this meeting had been prearranged, no follow up was made to further press Mrs. Barth regarding her husband's location.

20

With regard to Barth's possible presence in Delaware, authorities simply accepted the quick assurance of the Dover police that they had no record of Barth.

Finally, we note that prosecutorial authorities did not contact Barth's parents or siblings. Indeed, they did not even call Barth's father whom they knew to have both a financial and familial incentive to keep track of Barth.7

Given Barth's crucial role in the prosecution's case, we are left with the firm conviction that the prosecution's efforts to assure Barth's presence would have been far less casual had the shoe been on the other foot. If the prosecution had not had Barth's preliminary hearing testimony and had needed Barth's presence at trial, we are confident that the resources and effort devoted tofinding him prior to trial would have been greater than they in fact were. To countenance such a disparity would ill serve the interests protected by the Confrontation Clause. See United States v. Mann, 590 F.2d 361, 367 (1st Cir. 1978) (noting that "[t]he government did not make as vigorous an attempt to secure the presence of the witness as it would have made if it did not have the prior recorded testimony."); Lynch, 499 F.2d at 1024 ("It is difficult to believe that if the preliminary hearing testimony of this critical witness were not available,

_____

7. The four witnesses who testified about the efforts of the state to secure
Barth's presence did so during the week before trial. After hearing their testimony, the trial judge was sufficiently concerned about the situation that he directed the ROR officer to contact Barth's family over the weekend preceding trial. On August 9, the day trial commenced, the prosecutor informed the trial judge that ROR officers had unsuccessfully attempted to contact Barth's brother, but had spoken with Barth's parents who told them that they had not seen Barth in months. Defense counsel refused to stipulate to the prosecutor's summary of ROR efforts and instead demanded the opportunity to cross-examine the officer. The trial judge then announced his ruling that Barth was unavailable, and requested the prosecution to continue its efforts to locate Barth. We have reviewed the record and have found no other discussion of the ROR's efforts to locate Barth before his testimony was read to the jury. This information does change our analysis. In light of defense counsel's refusal to stipulate to this information, the trial judge's decision was based upon the prior information received in court. Accordingly, we believe that our focus must be on the record of the prosecutorial efforts established in the trial court's evidentiary hearing discussed above.

the prosecution would have abandoned its efforts at this point to locate [the witness]."). Accordingly, we hold that Barth was not constitutionally unavailable and that the prosecution's use of Barth's preliminary hearing testimony violated McCandless's rights under the Sixth Amendment.

Given the facts we have recounted, we believe the District Court's reliance on Roberts v. Ohio, 448 U.S. 56 (1980), was misplaced. There, the defendant was indicted and convicted of forgery and receiving stolen property. An acquaintance of the defendant, Anita, testified at the defendant's preliminary hearing but did not appear at trial. The prosecution sought to introduce Anita's preliminary hearing testimony at trial, and offered the following evidence to establish Anita's "unavailability":

> Anita, according to her mother, left home for Tucson, Ariz., soon after the preliminary hearing. About a year before the trial, a San Francisco social worker was in communication with [her parents] about a welfare application Anita had filed there. Through the social worker, the [parents] reached their daughter once by telephone. Since then, however, Anita had called her parents only one other time and had not been in touch with her two sisters. When Anita called, some seven or eight months before trial, she told her parents that she `was traveling' outside Ohio, but did not reveal the place from which she called. . . . [Her mother] knew of no way to reach Anita in case of an emergency. Nor did she `know of anybody who knows where she is.'

Id. 59-60. The Supreme Court concluded that Anita was "unavailabl[e] in the constitutional sense." Id. at 75. The court noted that prosecutors had taken affirmative steps to locate Anita by contacting her parents at Anita's last known address, but that the prosecutors had "no clear indication, if any at all, of Anita's whereabouts." Id. at 75-6. The Court further found no constitutional violation in the prosecution's failure to contact the San Francisco social worker because "the great improbability that such efforts would have resulted in locating the witness, and would have led to her production at trial, neutralize[d] any intimation that a concept of reasonableness required their execution." Id. at 76.

22

We find McCandless's case materially different. First, the Roberts prosecutors had no current reliable lead regarding Anita's location; they knew nothing more about Anita's whereabouts than that she was "traveling" outside the state and had stopped in San Francisco a year earlier. Here, however, authorities had a fresh lead from Mrs. Barth. Their failure to adequately investigate this fresh lead is not comparable to a failure to follow up on the year-old tip that Anita had been in San Francisco. Second, the facts of Roberts did not trigger heightened Sixth Amendment concerns because (i) Anita's testimony was not as crucial to the prosecution's case as Barth's was in the instant case, and (ii) the Roberts defendant was charged with the relatively minor crimes of forgery and possession of stolen property, not capital murder. Finally, the prosecution in Roberts had no connection or relationship with Anita comparable to the cooperation agreement in this case.

IV.

We conclude that McCandless failed to fairly present his double hearsay and prosecutorial vouching claims to Pennsylvania's courts, and that his unexcused procedural default of those claims precludes their review in federal habeas corpus. We will also reject McCandless's claim for habeas relief based upon Pennsylvania's violation of Article V(d) of the IAD because, under our circuit jurisprudence, violations of Article V(d) do not justify habeas relief.

We conclude, however, that the prosecution did not satisfy its Sixth Amendment duty to make reasonable good faith efforts to obtain Barth's presence at trial. Accordingly, we will reverse the judgment of the District Court and remand with instructions that it order McCandless's release from confinement unless he is retried and convicted within a reasonable time.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

23