**Kerby Keane KELLER, Petitioner,**

v.

**Superintendent LARKINS, et al., Respondents.**

**No. CIV. A. 99–2791.**

United States District Court, E.D. Pennsylvania.

Feb. 29, 2000.

Carmen C. Nasuti, Nasuti and Miller, Philadelphia, PA, for Petitioner.

K. Kenneth Brown, III, Lancaster, PA, for Respondents.

### MEMORANDUM & ORDER

KATZ, Senior District Judge.

Before the court is Kerby Keane Keller's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Although the issues raised by Mr. Keller present difficult questions that warrant the granting of a certificate of appealability, the trial errors asserted do not rise to a level that would permit this court to grant relief.

## I. Background [1]

On the evening of June 20, 1989, Kerby Keller killed his wife Barbara, from whom

---

1. As these events have been described in detail elsewhere, only a brief narration is necessary.

he was separated, when she returned to his farmhouse to visit their son. Keller also shot at Gary Reiter, a neighbor who came to the farmhouse after receiving a call from Keller and after hearing gunshots. Keller had learned earlier that day that Reiter had engaged in a romantic relationship with Barbara Keller.

At trial, the state and the defense presented very different theories of the events of June 20. The defense focused on Keller's state of mind and argued that he was incapable of forming the intent necessary for a first-degree murder conviction. The defense attempted to show that the killing and the attempted killing were the product of Keller's extreme emotional state caused by his anguish over his separation from Barbara and her refusal to reconcile, the revelation that Reiter was having an affair with Barbara, and Barbara's statement that she was returning to nude dancing. Keller testified that he could not remember killing Barbara or shooting at Reiter. In support, his trial counsel Joshua Lock offered the testimony of Dr. Abram Hotstetter, a practicing psychiatrist, who rendered a diagnosis of major depressive illness and his opinion that Keller was insane at the time of the shooting.

The state advanced, at least implicitly, alternative theories of the crime. The first relied heavily on the fact that Barbara Keller had been an informant for the FBI for many years and suggested that Keller, who had been a member of the Pagans, a motorcycle gang that had been under investigation, killed his wife either in retaliation or to silence her. This theory also implied that Keller attempted to kill Gary Reiter to silence him in the event that Barbara had revealed incriminating information in the course of their relationship. The government's second theory suggested that Keller had planned to kidnap, possibly torture, and kill both his wife and Reiter in retaliation for her decision to leave him and engage in a relationship with Reiter.

On March 16, 1990, Keller was convicted in the Lancaster County Court of Common Pleas of the first-degree murder of Barbara Keller and of the attempted murder of Gary Reiter. Keller appealed his conviction directly to Pennsylvania's Superior Court and Supreme Court without success; he also filed similarly unsuccessful postconviction collateral appeals. He is presently serving a life sentence for the murder conviction to be followed by a five-to ten-year term of imprisonment for the attempted murder conviction.

## II. The Petition for a Writ of Habeas Corpus

Keller's petition for a writ of habeas corpus raises three arguments. The first asserts that his due process right to a fair trial was violated by the admission of evidence regarding his own association with the Pagan motorcycle gang and his wife's role as an informant for the FBI. He also argues that trial counsel was ineffective for failing to cross-examine the state's expert witness adequately and for failing to object to certain jury instructions.

With respect to the ineffective assistance of counsel claims, the court adopts the magistrate judge's report and recommendation that these claims were properly exhausted. The court also adopts the report and recommendation's conclusion that the ineffective assistance claim pertaining to jury instructions does not articulate a basis for relief. The court writes separately on the due process claim and the first ineffective assistance claim.

### A. Exhaustion

■ Before addressing the merits of either claim, the court must consider whether Keller exhausted his due process claim.[2]

■ Absent exceptional circumstances, petitioners must exhaust all available state remedies before seeking federal habeas relief. *See* 28 U.S.C.

---

2. The magistrate's report and recommendation concluded that Keller had not exhausted this claim and that it was procedurally defaulted.

§ 2254(b)(1)(A). That is, Keller must have "fairly presented" his claims to the Pennsylvania trial court, the intermediate appellate court, and the supreme court. *See, e.g., Evans v. Court of Common Pleas,* 959 F.2d 1227, 1230 (3d Cir.1992). "To fairly present a claim, a petitioner must present a federal claim's factual and legal substance to the state courts in a manner that puts them on notice that a federal claim is being asserted." *McCandless v. Vaughn,* 172 F.3d 255, 261 (3d Cir.1999) (citations, internal punctuation omitted). Even if the state law claims did not explicitly rely on a federal right, a claim is exhausted so long as the briefs in question showed reliance on federal or state case law utilizing constitutional analysis or described a claim in "terms so particular as to call to mind a specific right protected by the Constitution[.]" *Id.* (quoting *Evans,* 959 F.2d at 1232).

Keller never explicitly cited the federal due process clause as the basis for his objections to the admission of evidence pertaining to the Pagans and his wife's role as an informant, but it is clear that, from trial counsel's initial motion *in limine* to the state collateral appeals, Keller's objections were consistently premised on the notion that a fair trial was impossible if such evidence were admitted. Keller's pre-trial motion *in limine* requested the exclusion of evidence making "reference to Mr. Keller's alleged affiliation with the Pagan motorcycle gang" or "reference to an ongoing investigation of the Defendant or of the Pagan motorcycle gang" in order to "assure a fair trial for Mr. Keller." Def.Mot. in Limine at 2 (Feb. 19, 1990).

In Keller's post-trial motion, counsel argued that admission of evidence relating to Keller's association with the Pagans and his wife's role as an informant was so prejudicial that it outweighed any "legitimate probative value" that it might have had. Def. Brief on Post-Trial Mot. at 14. Both the appeal to the Pennsylvania Superior Court and the petition for allowance of appeal to the Pennsylvania Supreme Court again focused on the extensive prejudice from the admission of this evidence, and both explicitly argued that Keller was deprived of a fair trial as a result. *See* Brief for Appellant before Super.Ct. at 24 ("The admission of those matters into evidence in a case such as this had the ineluctable effect of prejudicing the jury against him and depriving him of a fair trial."); *id.* at 31–40 (describing ways in which admission of evidence deprived Keller of fair trial because of lack of probativeness and extreme prejudice); Pet. for Allowance of Appeal before Pa.Supreme Ct. at 21–29 (same; referring to inflammatory evidence); *id.* at 39 (concluding brief with statement that introduction of evidence had "totally deprived Mr. Keller of a fair trial").[3]

In short, Keller consistently referred to his right to a fair trial in terms specific enough to consider this claim exhausted. The court will thus consider Keller's due process argument on its merits.

### B. Standard of Review

Following the numerous changes made by 1996 legislation, 28 U.S.C. § 2254 states:

---

**3.** On this point, the Supreme Court's opinion in *Duncan v. Henry,* 513 U.S. 364, 115 S.Ct. 887, 130 L.Ed.2d 865 (1995) (per curiam), is distinguishable. In that case, a convicted defendant brought a habeas petition asserting that the admission of certain evidence violated his due process rights. In contrast to the present case, that defendant explicitly relied upon the California constitution and the California evidentiary code in making his claim to the state courts. *See id.* at 364–65, 115 S.Ct. 887. Moreover, he "specifically raise[d] a due process objection before the state court based on a different claim—that the pleading

was uncertain as to when the offense occurred." *Id.* at 366, 115 S.Ct. 887. In those circumstances, the Supreme Court held that the state courts had not been fairly notified that the defendant was raising a claim premised on the federal constitution. *See id.* Similarly, *McCandless v. Vaughn,* 172 F.3d 255, 262 (3d Cir.1999), is distinguishable. That petitioner raised challenges to prosecutorial vouching, and, although he couched it as a federal due process claim in his habeas petition, the lower court claims had not been framed as an inquiry into the "fundamental fairness of the entire trial." *Id.* at 262.

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Factual determinations made by a state court must be presumed correct unless the petitioner provides clear and convincing evidence to the contrary. See 28 U.S.C. § 2254(e)(1).

■■ Claims asserted under 28 U.S.C. § 2254(d)(1) require that the court engage in a two-part analysis. First, to see if a state court ruling was "contrary" to Supreme Court precedent, the habeas court should "identify the applicable Supreme Court precedent and determine whether it resolves the petitioner's claim." *Matteo v. Superintendent, SCI Albion,* 171 F.3d 877, 888 (3d Cir.1999). Phrased differently, "to obtain relief at this stage, a habeas petitioner must show that Supreme Court precedent requires an outcome contrary to that reached by the relevant state court." *Id.* (citations, internal punctuation omitted). If the court determines that the outcome was not contrary to the "applicable body of Supreme Court law—either because the state decision complies with the Supreme Court rule governing the claim, or because no such rule has been established"—the court should inquire as to "whether the decision was based on an unreasonable application of Supreme Court precedent." *Id.* at 889 (citations

omitted). Rejecting the stricter approaches of other circuits, the Third Circuit stated that the "appropriate question is whether the state court's application of Supreme Court precedent was objectively unreasonable." *Id.* at 889–90. On this point, it is appropriate to consider the rulings of lower federal courts. *See id.* at 890.

■ *Matteo* did not address claims brought under 28 U.S.C. § 2254(d)(2). *See Matteo,* 171 F.3d at 888. However, in *Hartey v. Vaughn,* 186 F.3d 367 (3d Cir. 1999), the Third Circuit looked to whether there was evidence in the record that was consistent with the state court's factual findings and whether the state court acted "unreasonably." *See id.* at 372–73. Thus, in addressing factual issues, this court should look to whether the state court's decision, evaluated objectively, resulted in an outcome that cannot reasonably be justified in light of the evidence presented in the state court proceeding.

## III. The Due Process Claim

Keller argues that the admission of evidence pertaining to his association with the Pagans and his wife's role as an informant deprived him of a fair trial. Petitioner argues that there was actually no evidence establishing that he was aware of his wife's actions, much less that he killed her because of them. Keller suggests that the state advanced the informant theory as a pretext by which to introduce otherwise inadmissible evidence regarding the Pagans and Keller's past.

### A. Disputed Testimony [4]

Although defense counsel moved *in limine* to exclude evidence pertaining to the Pagans, the trial judge considered objections on a case-by-case basis. *See* Order of February 21, 1990. Accordingly, with no objection from the defense, the state's opening statement articulated its theory

---

**4.** Although the petition for habeas corpus does not detail every instance of testimony that it believes was inappropriate, the court

understands Keller to object to all government references to the Pagans and Barbara Keller's role as an informant.

that Barbara Keller was killed because she was an informant. *See* Trans. at 43.[5] The defendant's opening, in turn, acknowledged that Keller "may even have been a member of an organized motorcycle club," *id.* at 47, but hinted that Keller had come to be aware of the FBI's interest in him because agents came to his farm, not because he discovered that his wife was an informant. *See id.* at 49. Lock also acknowledged that the defendant had written a suicide note stating that he was under stress because of the "unfounded investigations by the FBI, Crime Commission, et cetera[.]" *Id.* at 68. Lock concluded by telling the jury that they would have to decide whether Barbara Keller had been killed as a result of a domestic disturbance or because she was an informant. *See id.* at 68–69.

The state's case did provide some circumstantial evidence connecting Barbara's death with her role as an informant. First, Gary Reiter testified that Barbara had told him that she was providing information to the FBI about an organized motorcycle gang and that she was fearful of the consequences if her husband discovered this fact. *See* Trans. at 137–40. Although Lock objected to the testimony on hearsay and on relevancy grounds, the court admitted the evidence both as relevant and to show the victim's state of mind. *See id.* at 138–39. Reiter admitted on cross-examination that he had never told the police or other investigators about Barbara's comments to him prior to that day's testimony. *See id.* at 171–72. The state also presented testimony that Keller himself stated on the night of the killing that he was under pressure from investigations. *See, e.g., id.* at 266 (testimony by Officer Guth discussing suicide note previously described in Lock's opening); *id.* at 396–97 (testimony by Dorothy Seegan, victim's mother, stating that Keller told her on the night of the killing that he was under pressure because of the investigations).

In addition, FBI Agent Harelson testified that Barbara Keller contacted him by telephone in 1984 and began providing information regarding an investigation. *See* Trans. at 409. He explained, in response to a question about the "motorcycle gang," that Barbara continued to give him information "regarding criminal activity by Mr. Keller and some of his associates[.]" *Id.* at 410–11. Harelson also explained that Barbara was concerned for her safety and so put many limitations on the information she provided. *See id.* at 411. Harelson told Barbara that these conditions would make it very difficult for him to prosecute anyone, but she persisted, and Harelson testified that he complied with her demands. *See id.* at 411–12. He also testified that Barbara expressed fear of her husband should he find out and said that he had threatened to kill her if she ever went to the police. *See id.* On cross-examination, Harelson stated that he had no reason to believe that Barbara's husband or his colleagues had ever discovered her collaboration. *See id.* at 418–19.

The next significant event for present purposes is the defense's introduction of the word "Pagan." During the presentation of its case, the defense called Donald Kline and almost immediately asked him if he had been at any time a "member of the Pagan motorcycle club." Trans. at 514. Kline responded that he had been a member approximately fourteen years previously. *See id.* On cross-examination, the state asked Kline whether he had been in the "motorcycle club" with Keller; Kline again answered that he had but emphasized that Keller was no longer a member. *See id.* at 521–22. Following this exchange, the prosecutor asked the court at sidebar whether the "restrictions" on the use of the word "Pagan" were lifted. *Id.* at 522. After Lock stated that he intended to refer to the Pagans again, the court implied that the bar had been lifted. *See id.*

---

**5.** All references to the "transcript" refer to the trial transcript.

Subsequently, the word "Pagan" was mentioned many times. Many of these comments were fairly casual, as in the testimony of Randall Groff, Joan Elko, and John Anderson.[6] *See* Trans. at 545 (prosecutor asking Groff if his workplace was a "Pagan hangout" and asking if a former bartender, who had since died, was a leading Pagan)[7]; *id.* at 916 (cross-examination by state asking if many motorcyclists came to the bar where Elko worked and if she associated with Pagans); *id.* at 1096–98 (cross-examination of Anderson asking whether he was a Pagan and whether he knew of Keller's previous involvement with the organization; defense objection precluded further questioning).[8]

The testimony of three witnesses—the defendant, Sherry Aument, and John Barton—deserves special comment. Probably the most significant discussion of the Pagans occurred during Keller's own testimony. In response to his own counsel's question, Keller stated that he had been a Pagan but that he had withdrawn from the organization several years previously; he explained that he had reaffirmed that separation as part of his marriage vows. *See* Trans. at 717–18. Keller also testified that

he became aware of investigations targeting him because of direct contact with the Pennsylvania Crime Commission, local police, and the FBI. *See id.* at 718–20. On cross-examination, the government questioned Keller extensively on the Pagans and clearly attempted to draw a connection between the organization's alleged violence and Keller's own actions. *See, e.g., id.* at 785–86.[9] The state accused Keller of having a "propensity for violence," *id.* at 806, and, soon thereafter, engaged in a lengthy discussion of the significance of the emblems on his Pagan jacket, suggesting repeatedly that he was a member of an "outlaw motorcycle gang." *Id.* at 808–09.[10] The government questioned Keller at length about the organization of the Pagans, whether he distributed cash for the Pagans, whether he was a leader, and whether Barbara ever carried cash for him. *See id.* at 809–12. The last comment was excluded upon defense counsel's objection. *See id.* at 811–12.

The state was also permitted to inquire about Keller's relationship with various individuals who had been members of the Pagans. For example, the government elicited testimony from Keller that one

---

**6.** Randall Groff was a friend who had picked up the Kellers' son that evening; Joan Elko was one of Barbara's friends who was called to testify about some of Barbara's sexual predilections; and John Anderson was the employer of another witness discussed subsequently.

**7.** During the state's direct, the prosecutor asked Groff whether he "belong[ed] to the same motorcycle organization that Mr. Keller belongs to[.]" Trans. at 108. The prosecutor also asked, "Are you aware that the police have alleged that he belongs to a—" *Id.* The court sustained an objection at this point, but the state was permitted to inquire further as to Groff's and Keller's involvement in the "motorcycle organization." *See id.* at 109.

**8.** One additional reference to the Pagans was initiated by the defendant. During the cross-examination of Bonnie Rosengrant, Lock asked if her former boyfriend was a member of the Pagans. *See* Trans. at 993–94. The government's cross-examination briefly inquired as to the same issue. *See id.* at 1000–01.

**9.** The following exchange occurred:

Q. Mr. Keller, isn't it true that your psychological problem, if you have one, is that you are a very, very violent man. Isn't that correct?
A. I wouldn't say that.
Q. And have you been a very, very violent man all your life.
A. No, I haven't.
Q. All your adult life, isn't that correct?
A. No.
Q. Don't the Pagans have a reputation for being a very violent organization?
A. I don't think so.
Q. You don't think so?
A. No.
Q. Maybe some other people have opinions on the reputation of the Pagans.

*Id.* at 785–86. Upon Lock's objection, the court struck the last sentence.

**10.** Keller explained that the emblems meant that his organization was not associated with the American Motorcycle Association. *See id.* at 808–09.

woman who had called him was the wife and mother of two individuals who had led the Pagans. The government then asked whether the son was in prison for murder, although Lock's objections were sustained as to further questioning. *See* Trans at 828–30. The prosecutor then inquired about Keller's phone records, and, upon defense counsel's objection, stated that he intended to demonstrate that Keller was lying about his retirement from the Pagans based on the number of connections he still had. The judge permitted this testimony for credibility purposes and indicated that he would instruct the jury as to the limited inferences they could draw. *See id.* at 835. The state then established that Keller received calls from several incarcerated Pagans and that he had kept court documents from some of their trials. *See id.* at 835–38. Finally, the state asked Keller whether his wife wore Pagan "colors" and whether he, as a Pagan, considered Barbara to be his property. *See id.* at 860–61.

Keller's attorney also objected vigorously but unsuccessfully to the testimony of Sherry Aument and John Barton. The government argued, and Aument testified, that contrary to Keller's own testimony, Aument had been his girlfriend for some time during his marriage. Although the government strongly suggested at sidebar that Aument would testify extensively about Keller's relationship to the Pagans, her only testimony on the subject came on cross-examination when Lock asked if there were many motorcyclists at the bar she frequented. *See* Trans. at 1024–25. Based on the government's representation that Aument would testify in more detail, however, the court gave a limiting instruction prior to her testimony that the jury was not to consider Keller's association with the Pagans when deciding guilt; any such evidence was admitted only "to give you as complete a picture of the testimony that this witness has to say about the time period in question." *Id.* at 1007; *see also id.* at 1002–07 (argument on admissibility).

John Barton's testimony was more extensive. Barton was called by the government to testify that when he had once asked Barbara Keller to dance at a bar, Keller became angry and physically assaulted him. *See* Trans. at 1046–47. The government stated that it wished to offer this testimony because (1) Keller had stated that he was a Pagan while he was abusing Barton, and (2) it supported the government's psychiatric diagnosis of sadistic personality disorder, which is discussed in more detail subsequently. *See id.* at 1048. The government also argued that it should not be prohibited from discussing the Pagans given that the defense first mentioned the word. *See id.* The court permitted the testimony, stating that because Keller had testified that he had terminated his association with the Pagans, the evidence was relevant. *See id.* at 1050. Barton then testified about the altercation: "He got me down on the floor. He had me busted up pretty good. I had two black eyes, blood all over the place. I still kept trying to get back up. As I got back up he pried my finger back like this. He broke my finger." *Id.* at 1052. He also testified that during the incident Keller stated that "I'm a Pagan." *Id.* at 1053.

In addition to these discussions of the Pagans, the trial testimony brought forth several additional references to the investigations against Keller. Besides the testimony described previously, George Gibble, Keller's realtor and friend; Richard Gray, his attorney; and James Seegan, the victim's father, each stated that when Keller called them after the killing, he said that he was under pressure from FBI investigations. *See* Trans. at 617 (Gibble); *id.* at 635 (Gray); *id.* at 659–60 (Seegan). Gray noted, though, that when a reporter called following the case's inception and asked whether Barbara had been an informer, Keller acted surprised upon hearing of the question. *See id.* at 648–49. Seegan's testimony was inconsistent with earlier statements, and the judge mentioned this fact specifically in the jury instructions. *See id.* at 1047.

The closings of both parties referred to the Pagans and the investigations against Keller. The defense reiterated that the jury could not find Keller guilty based on his past associations and emphasized that he was no longer a Pagan, *see* Trans. at 1114, 1131, although Lock recognized that Keller had continued his association with members of the organization. *See id.* at 1120. Lock also acknowledged that Barbara was providing information to the FBI, *see id.* at 1119, but stressed that there was no evidence indicating that Keller knew. *See id.* at 1128, 1134, 1146, 1169–71. For its part, the prosecution relied heavily on Keller's association with the Pagans, although many such references emerged as a challenge to his credibility. *See id.* at 1199–1200. The state repeatedly suggested that Keller killed his wife because she was an informant. *See id.* at 1200, 1210, 1213, 1224–25. Following the closings, the court instructed the jury that they could not use Keller's prior associations or actions as evidence to find him guilty. *See id.* at 1246.

### B. Lower Court Resolution

Keller's post-trial motions asserted that the trial court erred in admitting this evidence of his involvement with the Pagans and of Barbara's role as an informant. *See* Trial Ct.Opin. at 6–7 (Apr. 6, 1992). Rejecting this claim, the trial judge stated that the evidence had been properly admitted because

the evidence concerning the defendant's prior association with the Pagan motorcycle gang was closely related to the crime for which defendant was being tried. The record indicates that the victim had provided information to the FBI regarding the criminal activity of defendant and the Pagan motorcycle gang for approximately six (6) years. Furthermore, the victim told the FBI that defendant had threatened to kill her if she went to the police with any information regarding his criminal activities with the Pagan motorcycle gang. Hence, defendant's affiliation with the Pagan motorcycle gang and the victim's role as a

confidential informant are both probative and relevant to the charges brought against defendant.

Moreover, in addition to the testimony of the FBI special agent, defendant himself furnished evidence of his motive to commit the murder. Specifically, defendant prepared a suicide note which related the killing to the FBI investigation of himself.

*Id.* at 8 (citations omitted). The court also noted that during conversations with various people on the night of the killing, Keller stated that he was under stress from the investigations. *See id.* at 9. Finally, the court stated that Keller's objections to the admission of evidence about the Pagans were baseless, as the defense had itself used the term for the first time. *See id.*

On direct appeal, the Superior Court agreed that the connection between the Pagans, Barbara's role as an informant, and the killing was sufficient to establish relevance:

The trial court found that there was a substantial nexus between the Commonwealth's proffered motive and the killing (*i.e.*, appellant killed his wife because she had told law enforcement officials about his involvement with the Pagans). Accordingly, wife's role as an informant and appellant's association with the Pagans was relevant to the Commonwealth's theory of motive and specific intent.

Super.Ct.Opin. at 6 (July 28, 1993). As to the claim that the evidence was excessively prejudicial, the court found that the "evidence as to the victim's association with the FBI was probative of appellant's motive and specific intent to kill her." *Id.* at 7. Like the trial court, the Superior Court stressed the suicide note and Barbara's expressed fears as to her safety if Keller discovered her actions. *See id.* The court also ruled that the defense's introduction of the word "Pagan" legitimized its subsequent use, and that, in any event, the evidence regarding the Pagans "did not

refer to specific instances of criminal activity." *Id.* The court agreed that the reference to the motorcycle gang was "necessary" to establish motive, *see id.* at 8, and concluded that the "evidence concerning appellant's association with the Pagans was so vague that the jury could not infer any past criminal conduct on his part. Moreover, the trial judge specifically cautioned the jury as to the limited use of this evidence." *Id.*

The Pennsylvania Supreme Court denied the petition for allowance of an appeal without opinion. *See* Order of Nov. 29, 1993.

## C. Discussion

### 1. Standards

The admission of evidence at a state court trial may, in some circumstances, rise to the level of a constitutional violation. *See Lesko v. Owens,* 881 F.2d 44, 51 (3d Cir.1989); *see also Estelle v. McGuire,* 502 U.S. 62, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) (acknowledging propriety of habeas relief for evidentiary errors of constitutional significance). A federal court considering a petition for habeas relief should not merely review state evidentiary errors, as any such mistakes "are not considered to be of constitutional proportion, cognizable in federal habeas corpus proceedings, unless the error deprives a defendant of fundamental fairness in his criminal trial." *Bisaccia v. Attorney General,* 623 F.2d 307, 312 (3d Cir.1980). "When it must be said that the probative value of such evidence, though relevant, is greatly outweighed by the prejudice to the accused from its admission, then use of such evidence by a state may rise to the posture of fundamental fairness and due process of law." *Lesko,* 881 F.2d at 52 (quoting *Bisaccia,* 623 F.2d at 313); *see also id.* (looking to whether evidence's "probative value is so conspicuously outweighed by its inflammatory content ... as to violate a defendant's constitutional right to a fair trial"). In making this assessment, this court must accord the state court deference in its resolution of evidentiary matters. *See id.* at 52.

If the court finds that the probative value of the evidence was so outweighed, the court must then consider whether the error was harmless beyond a reasonable doubt. *See Bisaccia,* 623 F.2d at 313; *see also Lesko,* 881 F.2d at 49 n. 7 (acknowledging that if evidence is inflammatory, it is "difficult to envision how such an error could be considered 'harmless' ").

### 2. Application

This court cannot conclude that the state courts' conclusions were objectively unreasonable, either in their factual findings or in their application of federal law. In conducting this analysis, the court sees two largely separate issues: (1) the state's proof of the connection between Barbara's collaboration and her death, found principally in the testimony of Reiter, Harelson, and those individuals discussing the investigations, and (2) explicit references to the Pagans and their practices.

As to both categories, the court agrees that the evidence at issue was, to varying degrees, probative. With respect to Barbara's role as an informant and the related issues pertaining to the investigations, the trial court relied primarily on state court opinions finding that evidence of motive is always probative, particularly when it tends to show specific intent to kill. *See* Trial Ct.Opin. at 7–8; *see also* Super.Ct.Opin. at 6 (accepting this resolution); *Lesko,* 881 F.2d at 53 (noting that "evidence of motive may be probative of specific intent, particularly for crimes that are allegedly motivated by the desire to interfere with law enforcement"). While the state had no direct evidence that Keller killed his wife to silence her, the combination of Reiter's testimony, Harelson's testimony, and the evidence relating to Keller's own statements that he was under pressure from investigations, certainly produced circumstantial evidence of this theory. The court does not suggest that this evidence was necessarily strong, and a

fair reading of the trial transcript certainly indicates that the bulk of the evidence supported a jealousy motive for the killing. However, the evidence of the state's theory was not so weak as to be rendered non-probative.

Although the court will speak to these issues in more detail shortly, the court also finds the evidence regarding the Pagans to be probative, although less so. The trial court found that the evidence pertaining to the Pagans was properly admitted because the defendant himself introduced the term. *See* Trial Ct.Opin. at 9. The court agrees with this conclusion as to the passing references to the Pagans, as in the testimony of Elko, Groff, and Anderson. Also, although not specifically discussed in the trial court's opinion, that court consistently overruled defense objections to detailed inquiries about the Pagans, as in Barton's testimony, on the ground that such questions went to the defendant's credibility. This court cannot say that the evidence was not probative: the defendant had testified that he was no longer a member of the Pagans, and, given the state's theory of the case, evidence pertaining to truthfulness on this subject was significant.

The question then becomes whether evidence of Barbara's collaboration and the related investigations or the evidence regarding the Pagans was so prejudicial as to deprive the defendant of a fair trial. The state courts focused largely on the testimony regarding the collaboration and the investigations, apparently concluding that the probativeness was so strong that there was no chance that the evidence was inflammatory. As to the Pagans, although the trial court did not explicitly address this issue besides stating that the defendant himself had introduced the term, the Superior Court reiterated its belief that the evidence was extremely probative and further concluded that the evidence was not excessively prejudicial given (1) defense counsel's strategic choice to introduce the term "Pagan," (2) the generic discussions of the group's criminal activities, and (3) and the trial court's jury instructions regarding the limited use to

which the evidence could be put. *See* Super.Ct.Opin. at 7–8. As to the specific challenge to the cross-examination of Keller and the direct testimony of Barton and Aument, the Superior Court found that this was proper impeachment, *see id.* at 9–10, and that it was not overly prejudicial because of its relationship to the state's psychiatric diagnosis and because of limiting instructions. *See id.* at 11–12.

■ This court finds that the state courts did not act in an objectively unreasonable manner in drawing these conclusions. The testimony regarding Barbara Keller's collaboration with the investigations, while, almost by definition prejudicial, was not excessively prejudicial or inflammatory. Evidence is " 'unfairly' prejudicial if it 'appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish, or otherwise may cause a jury to base its decision on something other than the established propositions in the case.' " *Lesko,* 881 F.2d at 55 (quoting *United States v. Guerrero,* 803 F.2d 783, 785 (3d Cir.1986)). While evidence that Keller's wife was providing information on him or his associates to the FBI certainly would not have improved the jury's opinion of him, it was evidence that was closely related to the state's theory of the case, particularly given that the trial court did not permit the state, at least initially, to delve into the bases of the investigation or the alleged criminal acts committed by the Pagans.

The court also agrees with the state court that the passing references to the Pagans were not overly prejudicial given defense counsel's decision to introduce the term and the general description of the group. Most questions asked whether various witnesses associated with Pagans; very few questions, besides those dealing directly with Barbara Keller's work with the FBI, addressed criminal activity.

It is a closer case as to the state's cross-examination of Keller and Barton's testimony. Again, however, the court finds

that the state courts did not act unreasonably in ruling as they did. The cross-examination of Keller, particularly regarding his jacket and his friendship with incarcerated individuals, was probably only marginally probative of his credibility. The information elicited, however, was not the type that was so inflammatory as to deprive Keller of a fair trial: the term "Pagans" had already been introduced, and while the simple identification of the organization did not justify unlimited inquiry into its actions, the state's questioning did not bring up any specific criminal actions involving Keller. Nor could the fact that Keller owned a Pagans jacket or that he remained friendly with individuals in jail be construed as being so inflammatory that a reasonable jury would have lost its ability to deliberate fairly.

■■■ The testimony of Barton is most troubling. However, Barton's statement recounting Keller's claim that he was a Pagan goes directly to the credibility issues discussed previously. The description of the graphic violence that is perhaps more objectionable was admitted primarily to prove the government's diagnosis of sadistic personality disorder and not to prove that Keller was lying about his disassociation with the Pagans. Even if there were not an alternative justification for the testimony, however, Barton's testimony was not so inflammatory as to taint the whole trial, given the relatively minor role this testimony played and given that the trial judge issued limiting instructions at least twice stating that the jury could not consider Keller's past associations as evidence of present guilt or as evidence of criminal propensities. *See* Trans. at 1246.

### 3. Conclusion

To summarize, the court cannot find that the state court's evidentiary rulings that the state could present testimony pertaining to the Pagans, Barbara Keller's collaboration with the FBI, and related investigations were objectively unreasonable under Supreme Court precedent or applicable federal law. Similarly, to the extent that the state courts relied on factual con-

clusions, this court cannot say that those conclusions were objectively unreasonable. The most troubling aspects of the testimony—the cross-examination of Keller and the testimony of Barton—simply do not rise to the level of constitutional error.

### IV. Ineffective Assistance

Keller also argues that his trial counsel's performance in cross-examining the state's expert witness was so deficient that it deprived Keller of his right to counsel. While the court finds that counsel erred, Keller has not met his burden of showing that this behavior affected the outcome of the trial.

### A. The Trial Performance

The defendant offered psychiatric testimony from Dr. Hotstetter in support of his claim that he was not guilty by reason of insanity. In response, the government called its own expert, Dr. Kurtis Jens, a psychiatrist. Dr. Jens first testified that Keller was not insane and generally attempted to rebut Dr. Hotstetter's conclusions. Then, in response to an extremely lengthy hypothetical question asking if there were any alternative diagnosis that he would proffer assuming that Keller had engaged in pervasive domestic violence towards at least two women, that he reacted violently when other men expressed an interest in "his" women, that he limited his wife's ability to socialize, and that he was interested in violence and martial arts, Dr. Jens testified as follows:

> Well, what you have described could describe one of two diagnoses. One would be antisocial personality disorder. To make that diagnosis, I would need to know that some of this occurred before age eighteen because that kind of problem is one that starts earlier and it displays that sort of pattern. The antisocial personality disorder would be more associated with, in addition to what you described, substance abuse and illegal activities.

If what you described were a pervasive pattern that happened over and over again, as you said, if it were not just in the context of the marriage but in other relationships, if it were not just in the context of relationships but included a fascination with all kinds of violence, and if it developed later in life, then we would call it a sadistic personality disorder, which is a common, well-known, pattern of behavior.

Trans. at 943. This statement comprised the disputed diagnosis of sadistic personality disorder.

During cross-examination, Lock established that, as did Dr. Hotstetter, Dr. Jens relied upon the third edition of the Diagnostic and Statistical Manual (the DSM–III) in evaluating Keller. *See* Trans. at 946 *et seq.* He then cross-examined Dr. Jens extensively on his rejection of Dr. Hotstetter's diagnosis. Questioning regarding sadistic personality disorder, however, was limited. Lock asked whether a diagnosis of "an antisocial disorder of one sort or another, a sadistic personality disorder" precluded another diagnosis. Dr. Jens agreed that it did not. *Id.* at 978–79. Lock also suggested that Dr. Jens would need to consider additional evidence to make a true diagnosis, a fact with which Dr. Jens also agreed. *See id.* at 978–80. Lock then questioned Dr. Jens about the Pagans, and Dr. Jens stated that involvement in an organization such as the Pagans could create indications of sadistic personality disorder, *see id.* at 980–81; Dr. Jens also conceded that he had been unaware that Keller was a Marine who served in Vietnam. *See id.* at 981.

Keller's objection to his counsel's performance stems from the importance of this seemingly conditional diagnosis to the course of the trial. In the testimony of at least three witnesses, the government was permitted to inquire over defendant's objection as to specific, graphic incidents of violence in order to establish sadistic personality disorder. *See id.* at 789–91 (Keller's cross-examination in which prosecution asked whether he chained Aument to a bed rail and "beat her 'til she pled for her life'" and whether he ransacked her apartment); *id.* at 826–27 (late objection and government's response) [11]; *id.* at 1010–20 (Aument's graphic testimony that Keller physically abused her on numerous occasions and that he threatened her and her family); *id.* at 1004–05 (Aument testimony over objection); *id.* at 1046–47 (Barton's testimony that Keller beat him and bent his finger backwards until it broke admitted in part to prove sadistic personality disorder). Also, the state relied on this diagnosis in its closing, stating that rather than insanity, Dr. Jens found "meanness" and "violence," supporting a diagnosis of sadistic personality disorder. *Id.* at 1208–09.

### B. Post–Conviction Proceedings

Keller retained new counsel, Robert Beyer, to represent him in post-conviction proceedings. At the evidentiary hearing before the original trial judge, Beyer presented testimony by Susan Fiester, M.D., a clinical psychiatrist specializing in personality disorders and a member of the committee that evaluates and revises the DSM. She noted that at the time of the hearing, the DSM–IV was in use, rather than the DSM–III R [12] that had been authoritative at the time of trial. *See* Evidentiary Hearing (EH) Trans. at 124. She stated that sadistic personality disorder was referenced in the DSM–III only in an "appendix for influence and controversial categories," *id.* at 124, and that items were included in that appendix "to encourage research[.]" *Id.* at 125. The text specifically referred to sadistic personality disorder as a category "needing further study." *Id.*

She explained the history of sadistic personality disorder as follows:

---

**11.** Although this objection was untimely, the court specifically ruled on the basis of relevance. *See id.* at 873.

**12.** The DSM–III R was a revision of the DSM–III.

There was a basis for the concept of sadism and sadistic behavior in the psychoanalytic literature for many decades. Around the time of the DSM–III R, a clinician, who had had some experience with evaluating persons who had abused their spouses and children, started to do some empirical research to try to understand if there was some type of psychopathology in these individuals that led to their aggressive behavior. And this individual proposed some—a category and criteria that she believed might—would warrant further research and might help in a better understanding of the basis and causes and ways to treat abuse. *Id.* at 125–26. She stated that "it was not an accepted official diagnosis" at the time the DSM–III was in use. *Id.* Later, upon questioning from the judge, she stated that it was unlikely that it would ever be included as an official DSM diagnosis because the research to confirm it had not been performed. *See id.* at 154.

Dr. Hotstetter also testified, and he explained that the "diagnosis" of "sadistic personality disorder" was in

> an appendix at the back of the official diagnostic manual that psychiatrists use in classifying mental disorders and it was included with a couple of other possible diagnoses that some people felt may identify a particular group of mental disorders. But it was for further study and for people to look at it as they examined patients to see whether we could agree there was this distinct group of mental disorders.

*Id.* at 12. Like Dr. Fiester, he also testified that it was not included in the DSM–IV, *see id.* at 13, and that "at the time of trial in this case, ... sadistic personality disorder was not an accepted disorder among psychiatrists in America[.]" *Id.* at 14.

None of these issues were explored in cross-examination at trial because, as Lock acknowledged, he waived his right to require that the state disclose reciprocal expert witnesses. *See* EH Trans. at 36; *see also* Pa.R.Crim.P. 305(B), (C). While he assumed that the state would call an expert witness, *see* EH Trans. at 37–38, he never sought to discover the nature of that testimony or of any expert report, and, consequently, had no idea that Dr. Jens would present at least a conditional diagnosis of sadistic personality disorder. *See id.* at 38–39. He did not have the DSM–III with him, and he did not seek to speak with Dr. Jens prior to his testimony or retain his own expert, Dr. Hotstetter, to rebut any portion of Dr. Jens' testimony. *See id.* at 39–41; *see also id.* at 10 (Hotstetter's testimony agreeing with counsel's description of events). Finally, Lock stated that he did not know the status of sadistic personality disorder and its categorization in the DSM–III at the time he cross-examined Dr. Jens. *See id.* at 43–44.[13]

Following the post-conviction hearing, the trial judge ruled against Keller on this issue:

> We reject defendant's assertion that he was prejudiced by use of an improper diagnostic term or that use of this term interfered in any way with the search for the truth. First we note that [Sadistic Personality Disorder] was within the subset of diagnoses covered by 'Personality Disorder Not Otherwise Specified.' Next, we find a definition of [Sadistic Personality Disorder] in Appendix A of the handbook. Consequently, it is disingenuous to suggest that the definition may not be applied to the relevant diagnosis in the subset. By inclusion in the catchall provision, which is not contained in an appendix to the DSM–III R, [Sadistic Personality Disorder] has been accepted as a classification, albeit one undergoing scrutiny. We take judicial notice of the fact that defendant's own psychiatric expert, Susan Feister, M.D., who criticized Dr. Jens's use of the ... diagnosis, concluded as follows

---

**13.** While some portions of the DSM–III may have been brought to Lock during the trial, he could not remember what their content was. *See* EH Trans. at 41–43.

in a book chapter dated the same year as the trial:

> Thus, data available to date, while not extensive, suggest that sadistic personality disorder, as described in the DSM–III R describes a personality pattern with remarkably high internal consistency and descriptive validity.

Gay, M. and Feister, S., *Sadistic Personality Disorder,* in *Psychiatry* (ed. R.Michels, J.B. Lippincott, 1990), 1(21):1–13. Dr. Feister would have relied on this textbook to make a diagnosis, and we find the truth-determining process to have been preserved as regards use of the term [Sadistic Personality Disorder].

Trial Ct.Opin. at 8–9 (Oct. 21, 1996). The court also found that Lock was not ineffective in failing to recall Hotstetter to rebut the diagnosis, as he may have wanted to "let sleeping dogs lie," *id.* at 10, and suggested that "Mr. Lock's awareness of the possibility of alternate diagnoses might well have led him to avoid further rehearsing the Commonwealth's witness or, likewise, tipping his hand through his very questioning of the likely tack of the defense." *Id.* at 11.

The Superior Court adopted these conclusions as well, stating, In rejecting this claim, the PCRA court concluded that the diagnosis was, in fact, generally accepted and valid at the time of trial. The court noted that the diagnosis was included in the DSM–III and stated, "At the time of trial, it was a proposed diagnostic category, which needed further study. However, it also was subsumed in a subset of diagnoses covered by 'Personality Disorder Not Otherwise Specified.'" Super.Ct.Opin. at 9 (June 19, 1997). The court reiterated the lower court's statement that Dr. Fiester had agreed with this conclusion in an article. *See id.* at 10.

The Pennsylvania Supreme Court denied the petition for an allowance of appeal without opinion. *See* Order of July 1, 1998.

C. Discussion

The standards for evaluating an ineffective assistance of counsel claim are well-established. Under *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), a petitioner must first show that the attorney's performance fell below an "objective standard of reasonableness." *Id.* at 688, 104 S.Ct. 2052. The petitioner must then demonstrate that there is a reasonable probability that, but for counsel's deficiencies, the outcome of the case would have been different. *See id.* at 694, 104 S.Ct. 2052. A "reasonable probability is one sufficient to undermine confidence in the outcome of the proceeding." *Id.* The "effect of counsel's inadequate performance must be evaluated in light of the totality of the evidence at trial: 'a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.'" *United States v. Gray,* 878 F.2d 702, 711 (3d Cir. 1989) (quoting *Strickland,* 466 U.S. at 696, 104 S.Ct. 2052).

Following the discussed revisions to 28 U.S.C. § 2254, this court may not simply apply its own interpretation of the reasonableness of counsel's performance. Rather, it must determine whether the state court's resolution of the matter was objectively unreasonable. In addressing this issue, the court notes that the state court essentially ruled that, as sadistic personality disorder was a generally accepted diagnosis, counsel could not be faulted for failing to cross-examine on the subject or otherwise prepare. That is, the courts touched only briefly on the lawyer's actions and focused instead on the merits of the claim.

This court finds, even giving deference to the state court as required by statute, that Lock's performance fell below acceptable standards. Initially, under 28 U.S.C. § 2254(d)(2), the court finds that the state court's resolution of factual matters was objectively unreasonable: the evidence in the record, including Dr. Fies-

ter's testimony, Dr. Hotstetter's testimony, and the article co-authored by Dr. Fiester, does not support the conclusion that sadistic personality disorder was a fully accepted diagnosis such that counsel could be excused for failing to cross-examine on the subject. First, although the trial court suggested that inclusion of the sadistic personality disorder in what it termed a "subset" of diagnoses entitled "Personality Disorder Not Otherwise Specified" indicates that it was a fully accepted diagnosis, Keller points out that this section of the DSM–III actually refers to insurance coding practices, rather than diagnostic issues. *See* Pet. for Habeas Corpus at 37; *see also* DSM–III § 301.90. Also, the discussion of this disorder in the appendix to the DSM–III clearly states that it was a proposed category. *See* DSM–III app. A at 367. Second, the testimony of Dr. Fiester and Dr. Hotstetter was clear: Sadistic personality disorder was a proposed category and, almost by definition, was not a "true" diagnosis within the DSM–III. Finally, the article on which both the trial court and the Superior Court relied did not purport to offer sadistic personality disorder as an accepted diagnosis. It simply reviewed the literature and research that existed on this proposed category and concluded that the existing evidence was supportive of the classification. *See* Martha Gay & Susan Fiester, *Sadistic Personality Disorder, in Psychiatry* (ed. R.Michels, J.B. Lippincott, 1990), 1(21); *see also* EH Trans. at 120 (Fiester testimony stating that article consisted of a summation). Such a conclusion can have no bearing on the fact that, at the time of trial, sadistic personality disorder was only a proposed category. Dr. Fiester specifically testified that she would not have relied on such an article in making a clinical diagnosis. *See* EH Trans. at 122.

■ Given this conclusion, the court turns to the attorney's actions. Even if counsel's failure to recall Dr. Hotstetter following Dr. Jens' testimony might be excused as a tactical decision, the failure to inform himself of the very nature of Dr.

Jens' testimony was not. While the state court suggested that counsel may have meant to avoid tipping his hand, counsel admitted that he had no idea that Dr. Jens would offer a diagnosis of sadistic personality disorder at all. It is thus difficult to say that he made a strategic decision. "In the context of defense counsel's duty to investigate, 'strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.'" *Gray*, 878 F.2d at 710 (quoting *Strickland*, 466 U.S. at 690–91, 104 S.Ct. 2052). In other words, "Ineffectiveness is generally clear in the context of complete failure to investigate because counsel can hardly be said to have made a strategic choice against pursuing a certain line of investigation when s/he has not yet obtained the facts on which such a decision could be made." *Id.* at 711.

Obviously, the court is not suggesting that Mr. Lock failed to investigate the case as a whole: even a cursory examination of the trial transcript demonstrates that Lock engaged in extremely thorough investigation of many aspects of the case. However, all parties concede that the crux of the defense was Keller's state of mind, thus the expert testimony on the subject must be considered equally crucial. Given that Mr. Lock "offered no strategic justification for his failure" to interview Dr. Jens or even to exercise his ability to discover the nature of his testimony, *see Gray*, 878 F.2d at 711, it is impossible to state that he made a strategic choice. *Compare United States v. Kauffman*, 109 F.3d 186, 190 (3d Cir.1997) (finding that failure to investigate potential insanity defense resulted in a "cursory, uninformed judgment call"); *Berryman v. Morton*, 100 F.3d 1089, 1100–01 (3d Cir.1996) (upholding district court finding of ineffectiveness when counsel failed, without reasonable grounds for doing so, to investigate potential defense wit-

nesses that substantially undercut government's case), *with Hess v. Mazurkiewicz*, 135 F.3d 905, 908 (3d Cir.1998) (finding counsel not ineffective for failing to investigate and call witnesses when statement would not have been admissible and witnesses would likely have harmed defendant).

 Petitioner's claim founders, however, on the second *Strickland* prong. Looking to the likely effect of counsel's investigation and the resulting testimony, the court cannot state that the cross-examination, "if presented to a jury acting 'conscientiously ... and impartially,' would have led the jury to have a 'reasonable doubt'" respecting Keller's guilt. *Gray*, 878 F.2d at 713 (quoting *Strickland*, 466 U.S. at 695, 104 S.Ct. 2052). For these purposes the court assumes that, had counsel acted effectively, he would have (1) interviewed Dr. Jens and learned that he intended to offer at least a partial diagnosis of sadistic personality disorder, (2) discovered that sadistic personality disorder was only a proposed category, and (3) effectively cross-examined Dr. Jens on the subject.

None of these actions would have affected Dr. Jens' initial rebuttal testimony challenging Dr. Hotstetter's diagnosis on which defendant's own case hinged. Dr. Jens conceded on cross-examination that a diagnosis of sadistic personality disorder was not inconsistent with a finding of insanity, and there is no suggestion that Lock's cross-examination or other preparation on the issue of insanity was inadequate. That is, even with this admission that the diagnoses were not mutually exclusive, the jury clearly rejected the defendant's claim of insanity. Testimony that sadistic personality disorder was a proposed category would have had no effect on this issue.

Moreover, petitioner's suggestion that an effective cross-examination might have led to the exclusion of related testimony is unwarranted. The evidence adduced at the post-conviction evidentiary hearing did not suggest that a psychiatrist could not rely at all on the proposed category, and, in fact, Dr. Fiester herself indicated that it might properly be part of another diagnosis. *See* EH Trans. at 150–53. Dr. Jens could also have testified, as Dr. Hotstetter and Dr. Fiester acknowledged, that part of the purpose of including a sadistic personality disorder category in the appendix was to permit professionals to consider whether such problems were present in individuals they examined. In short, full cross-examination on the subject would only have revealed that the diagnosis was of a proposed psychiatric category, not that it was an inadmissible or improper consideration.

Accordingly, while petitioner suggests that had Lock conducted cross-examination thoroughly, the testimony of Keller, Aument, and Barton regarding Keller's violence would have been excluded, the court does not believe that petitioner has met his burden of showing that this would have been the case. Even assuming that petitioner is correct, however, the court cannot find that its exclusion would have affected the outcome of the trial. The real issue in the case was whether the defendant had the criminal intent necessary to be found guilty of first degree murder. None of this testimony went towards that question. While the testimony was not flattering to Keller, the court has already found that Barton's testimony, on its own, did not create prejudice rising to a constitutional error, and the court reaches a similar conclusion as to the testimony discussing Keller's abuse of Aument. Evidence of Keller's abuse of his wife had already found its way into the trial unchallenged, and the court cannot say that further evidence of abuse was a factor that likely affected the outcome of the trial.

## V. Certificate of Appealability

 Keller may not appeal this decision unless this court or an appellate court grants a certificate of appealability. *See* 28 U.S.C. § 2253(c)(1)(A). In order for this court to do so, the petitioner must

make a "substantial showing of the denial of a constitutional right." *Id.* § (c)(2). This means that the petitioner must make a "credible showing" that this court's procedural ruling was wrong and a "substantial showing that the underlying habeas petition alleges a deprivation of constitutional rights." *Morris v. Horn,* 187 F.3d 333, 340 (3d Cir.1999). The court finds that the petitioner has met both of these burdens.

## VI. Conclusion

The court concludes that, on the merits, petitioner's claims do not justify a writ of habeas corpus. This conclusion should not, however, overshadow the problematic nature of parts of Keller's trial. Keller's argument, taken at its strongest, suggests that even though the state knew that its proof of a killing motivated by a desire to silence an informer was weak, it chose to proceed on this theory as a means of introducing evidence of the defendant's past associations with a violent and notorious motorcycle gang. Similarly, counsel's failure to prepare a defense to the marginal diagnosis of sadistic personality disorder gave additional, if not dispositive, weight to the state's claims that evidence of graphic violence committed by the defendant was relevant. While the court ultimately concludes that these facts did not so infect the trial as to deprive the defendant of due process or the right to effective assistance of counsel, the defendant's persistent belief that he was treated unfairly is understandable, and, as noted, the court will grant a certificate of appealability on these issues.

## *ORDER*

**AND NOW,** this 29th day of February, 2000, upon consideration of the Petition for a Writ of Habeas Corpus, and the response thereto, and after review of the Report and Recommendation submitted by the Magistrate Judge, and the objections thereto, it is hereby **ORDERED** as follows:

1. The Report and Recommendation is **APPROVED** and **ADOPTED** with respect to the following conclusions:

 (a) that Petitioner's claims regarding ineffective assistance of counsel were properly exhausted; and

 (b) that Petitioner's claim alleging ineffective assistance of counsel for failure to object to jury instructions does not state a basis for relief.

2. The Petition for a Writ of Habeas Corpus is **DENIED**. Petitioner's due process claim was exhausted, but it does not provide a basis for the issuance of a writ of habeas corpus. Similarly, petitioner's claim of ineffective assistance of counsel related to trial counsel's failure to cross-examine the state's expert witness thoroughly does not provide a basis for the issuance of a writ of habeas corpus.

3. Petitioner has established probable cause and the court grants a certificate of appealability as to the following issues:

 a) Whether the admission of evidence pertaining to the Petitioner's involvement in the Pagans and his wife's role as an informant violated his right to due process; and

 b) Whether trial counsel was ineffective for failing to cross-examine the state's expert psychiatric witness adequately.