J-A24008-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
KHALIYFA NEELY :
:
Appellant : No. 1910 EDA 2021

Appeal from the Judgment of Sentence Entered August 23, 2021
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0009418-2017

BEFORE: PANELLA, P.J., BENDER, P.J.E., and SULLIVAN, J.

MEMORANDUM BY BENDER, P.J.E.:               **FILED FEBRUARY 23, 2023**

Khalifya Neely ("Appellant") appeals from the judgment of sentence of

twenty to forty years of incarceration, entered following his convictions for

homicide in the third degree for the murder of De'Vonn Pickett, aggravated

assault against Eric Reese, and possession of an instrument of crime. We

affirm.

Pickett died as the result of multiple stab wounds following an altercation

in the early morning hours of February 18, 2015, outside Che's Bar, located

in the West Mount Airy section of Philadelphia. Pickett had been drinking in

the bar with Eric Reese, Marcus Kincy, Detrick Lowman, and Devon Doram.

Pickett, Reese, and Kincy worked in the music industry and were in

Philadelphia rehearsing for an upcoming tour with Nicki Minaj. Lowman was

also employed in the music business and knew the three men. He was living

in Philadelphia and the four decided to meet and catch up with each other. Lowman's cousin, Devon Doram, joined them.

The five men initially met at another bar, Cavanaugh's. At some point, the group decided to visit Che's Bar, partly because the bartender, Travia Allen, knew several of the men, including Reese. Allen and Reese had known each for two or three years and had a romantic relationship. N.T., 2/24/20, at 56. Allen and Reese tended to get together when they were in the same town. *Id.* at 57. Allen was also friends with Appellant, who was drinking at Che's that evening, along with Anthony Torain and Pierce Boykin. Allen and Appellant had been friends since around 2000 and the two had a "friends with benefits" relationship. N.T., 2/19/20, at 107-08. Appellant also met up at Che's with another woman, Kenra Taylor.

At some point in the evening, the former owner of Che's arrived and caused a disruption when she went behind the bar to serve herself free drinks. As a result of this incident, the owner decided to close the bar down for the evening. Video surveillance established that Appellant and his friends left before Pickett and his group.

The details vary as to who said what outside, but it is undisputed that a melee broke out between the two groups of men, and that Reese and Pickett were stabbed during the altercation. According to Reese, after the owner closed the bar down, he and the rest of his group returned to Lowman's vehicle. N.T., 2/24/20, at 26. He texted Allen to ask if she was okay, and

she replied that she would be outside soon. *Id.* at 27. He went to escort Allen to her vehicle, as he wanted "to make sure she was okay after seeing what happened behind the bar." *Id.* at 28. Reese heard Pickett ask Allen, "Sis, are you good? Are you okay?" *Id.* at 30. Reese followed Allen to her car, and Reese "got halfway in" the passenger side. *Id.* at 32. He heard someone say, "Fuck you mean is she good?" *Id.* He walked back into the street. At this point, everyone from his group except Doram was there, along with Appellant, Boykin, and Torain. *Id.* at 34. Reese saw Appellant throw the first punch, targeting Pickett. Reese, who was next to Pickett, saw the two men square up to fight. *Id.* at 37. Reese saw Boykin "walk[ing] as if he's about to jump in. I turn around. I hit him." *Id.* He and Boykin, who he was able to identify because Boykin was the only one of the men wearing glasses, then fought. The two "pretty much were throwing fists" and Boykin managed to put Reese in a headlock. *Id.* at 39. Both men ended up tussling on the ground. At some point Reese "felt like I was getting kicked, maybe four[,] … five times." *Id.* at 42. He felt this sensation on his "whole left side, and then in the middle of my back toward my right." *Id.* at 43.

Reese believed that Lowman picked him up shortly thereafter. He saw Pickett on the ground and observed blood through his clothes. As he attempted to talk to Pickett, "Boykin ... starts coming after [him]." *Id.* at 46. Boykin chased him, and Reese became lightheaded and slowed. *Id.* at 47. Boykin approached Reese and accused him of sucker punching him; Reese

- 3 -

replied that he did not want any problems and struck Boykin to defend Pickett. Reese did not see Boykin with a knife at any point. *Id.* at 47-48. Boykin told him, "When I catch you, you dead like your cousin." *Id.* at 48. Reese started to run away, and Lowman pulled up in his car and picked up Reese. *Id.* Boykin was walking towards the car when they left. *Id.* at 49.

Lowman testified that he ended up tussling with Torain. N.T., 2/25/20, at 31. The two did not engage much physically. It ended when a woman yelled "[y]our friend is on the ground." *Id.* at 35. He and Torain let go of each other, and Lowman thought that Pickett may have been knocked unconscious. He told Dorman to get the car. He and Dorman then put Pickett in the car. *Id.* at 40. He recalled Marcus Kincy jumping in the car at some point, and then picking up Reese. *Id.* He saw a man near Reese, whom he recognized as "the person that [Reese] was tussling with." *Id.*

Kincy testified that he ran down an alley during the melee. He returned to the area about a minute later and saw Pickett on the ground. N.T., 2/20/20, at 139. Some fighting was still going on, and he "heard someone say something about going to … get a gun." *Id.* at 144. That was one of the reasons he, Lowman, and Doram put Pickett in the car and drove to Einstein Hospital. *Id.* At approximately 2:42 a.m., Officer Thomas Dempsey arrived at Einstein Hospital concerning two stabbing victims. *Id*. at 84. Staff informed him that Pickett died at 2:45 a.m. *Id.* at 89.

The police initially arrested Boykin and charged him with murder, in part because Kincy identified Boykin as the man who stabbed both Reese and Pickett. Kincy testified that he assumed Boykin did so, based on seeing "the guy with the glasses start[] swinging" on Pickett, and when he returned to the scene and saw Pickett on the ground, he assumed that Boykin was responsible. *Id.* at 211. Additionally, police searched Boykin's home and found a small amount of Reese's blood on Boykin's jacket. Boykin was held for trial following a preliminary hearing. Approximately eighteen months later, with his trial date three days away, he met with representatives of the District Attorney's office and implicated Appellant as the murderer. Boykin ultimately pled guilty to one count of aggravated assault for his role in fighting Reese. Boykin testified that he threw the first punch at Pickett but missed. N.T., 2/25/20, at 215. Reese then punched him and the two started fighting. *Id.* at 218. During the ensuing fight, he saw Appellant facing Pickett, and observed Appellant thrusting his arm once or twice. *Id*. at 225-26. Boykin saw a "glimmer" in Appellant's hand, and Pickett buckled and fell to the ground. *Id.* at 227. Appellant then ran over to break up Pickett and Reese, yelling at Reese to "[g]et off him." *Id.* at 230. Boykin stated that Appellant stabbed Reese. *Id.*

The Commonwealth apparently learned from Boykin[1] that Appellant had called after the attacks and said that he would be going to Abington Hospital. Heather Abebe, a physician's assistant at Abington Hospital, testified that she treated Appellant on February 18, 2015. The triage form indicated that Appellant arrived at 3:07 a.m. *Id.* at 141. Appellant stated he had been drinking and tried to slash his girlfriend's tires with a knife. *Id.* at 142-43. Ms. Abebe observed a large gash over Appellant's knuckle, at the base of his index finger on his right hand. *Id.* at 143. She testified that the injury was consistent with a knife folding over on the top part of Appellant's hand. *Id.* at 172. Appellant's blood was found near the location where Pickett was stabbed. N.T., 2/24/20, at 258-59.

Appellant's first jury trial resulted in a mistrial after the jury could not reach a unanimous verdict. Boykin did not testify at the second trial at issue here, and the trial court permitted the Commonwealth to read in his testimony from the first trial.

Following his convictions, Appellant filed post-sentence motions, which were denied. Appellant timely filed a notice of appeal and complied with the court's order to file a concise statement. The trial court filed its opinion, and the matter is now ready for our review. Appellant raises the following issues:

---

[1] During its opening argument, the Commonwealth explained that Boykin told "the Commonwealth certain things that we then corroborated. … [W]e didn't know that at that point, we got the records from Abington." N.T., 2/19/20, at 44-45.

1. Was the evidence insufficient to convict Appellant of Murder in the 3rd Degree and related charges for the killing of De[']Von Pickett, and Aggravated Assault and related charges as to the stabbing of Eric Reese as there was insufficient evidence to prove beyond a reasonable doubt that Appellant killed Mr. Pickett and stabbed Mr. Reese?

2. Did the [t]rial [c]ourt abuse its discretion by not finding the guilty verdicts entered against … Appellant were against the weight of the evidence?

3. Did the [t]rial [c]ourt err by granting the Commonwealth's [m]otion to [a]dmit the [p]rior [t]estimony of Pierce Boykin by finding that he was unavailable as defined by Pa.R.E. 804(a)?

4. Did the [t]rial [c]ourt err by not granting a mistrial after learning that a deliberating juror performed her own research into facts which were not presented into evidence?

5. Did the [t]rial [c]ourt err by denying Appellant's [m]otion to [r]econsider [s]entence when the sentencing hearing, which permitted participation by members of the victims' family via Zoom, was 'live-streamed' on various social media platforms, permitting multiple unidentified individuals to participate in the hearing and to publicly comment on Appellant's case and demand an excessive sentence?

Appellant's Brief at 3-4.

Appellant's first claim is that the evidence was insufficient to support all convictions. Our standard of review is well-settled:

We must determine whether the evidence admitted at trial, and all reasonable inferences drawn therefrom, when viewed in a light most favorable to the Commonwealth as verdict winner, support the conviction beyond a reasonable doubt. Where there is sufficient evidence to enable the trier of fact to find every element of the crime has been established beyond a reasonable doubt, the sufficiency of the evidence claim must fail.

The evidence established at trial need not preclude every possibility of innocence and the fact-finder is free to believe all, part, or none of the evidence presented. It is not within the province of this Court to re-weigh the evidence and substitute our judgment for that of the fact-finder. The Commonwealth's burden

- 7 -

may be met by wholly circumstantial evidence and any doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances.

*Commonwealth v. Tarrach*, 42 A.3d 342, 345 (Pa. Super. 2012).

Appellant does not challenge the elements of any of the crimes. Instead, he argues that "[t]he evidence presented … with regards to who actually stabbed Mr. Pickett and Mr. Reese is simply contradictory to such a degree that no reliable verdicts could have been reached." Appellant's Brief at 27-28. Appellant does not cite any caselaw. The principle that Appellant invokes was cogently summarized by our Supreme Court in *Commonwealth v. Farquharson*, 354 A.2d 545 (Pa. 1976):

> Traditionally under our system of jurisprudence, issues of credibility are left to the trier of fact for resolution. While there may be some legitimacy for a trial court, who has also observed the witnesses as they testified, to consider the weight of the evidence and to that extent review the jury's determination of credibility, there is surely no justification for an appellate court, relying solely upon a cold record, to exercise such a function.
>
> . . . .
>
> This concept, however, must be distinguished from an equally fundamental principle that a verdict of guilt may not be based upon surmise or conjecture. Following this principle, courts of this jurisdiction have recognized that where evidence offered to support a verdict of guilt is so unreliable and/or contradictory as to make any verdict based thereon pure conjecture, a jury may not be permitted to return such a finding.

*Id.* at 550 (citations omitted).

This is not one of those rare situations where the jury could not rationally conclude that Appellant was the perpetrator. The fight outside Che's

was assuredly chaotic, and the eyewitnesses offered differing accounts of what, if anything, happened in the bar before Tavia Allen left. There were also competing versions of who said what outside, as well as who threw the first punch. Appellant lists reasons to doubt the testimony of seven witnesses. Allen "did not testify to seeing anyone with a knife, nor did she specifically state she saw Appellant assault anyone." Appellant's Brief at 28. Taylor "did not give any specific testimony" regarding the fight. *Id.* Devon Doram likewise did not see anyone stab the victims. *Id*. at 29. Kincy initially identified Boykin as the man who fought Pickett, which contradicts Reese's account. *Id.* at 28. Additionally, Reese did not see a knife or any stabbing. Appellant also points out that Reese testified to Boykin chasing Reese and telling him he would be dead, which "indicate[s] that he (Boykin) knew that Pickett was fatally injured[.]" *Id.* Lowman denied seeing Appellant near Reese. Finally, Boykin claimed that he only struggled with Reese, but he pled guilty to one count of aggravated assault. *Id*. at 29. Boykin also had Reese's DNA on his clothing.

We agree with the Commonwealth that Appellant's arguments attempt to portray the evidence in the light most favorable to him. *See* Commonwealth's Brief at 10. For instance, it is true that Allen did not testify that she saw Appellant attack anyone. However, jurors are free to credit the testimony as they see fit. *Commonwealth v. Hill*, 210 A.3d 1104, 1112 (Pa. Super. 2019) ("It is within the province of the fact-finder to determine the weight to be accorded to each witness's testimony and to believe all, part, or

none of the evidence."). The jurors could rationally conclude that Allen was not forthright in her testimony. She claimed to experience "blackouts" about what happened during the rest of the night. N.T., 2/19/20, at 161-62. The Commonwealth obtained her phone records from that evening, which showed a seventeen-minute phone call at 3:02 a.m., and several phone calls between herself and Appellant between 2:35 a.m. and 5:48 a.m. *Id*. at 176-81. Allen stated that she did not remember any of these calls or what she discussed.

By focusing only on inferences in his favor, Appellant minimizes the evidence, both direct and circumstantial, establishing that he struck Pickett and Reese. First, Boykin implicated Appellant as stabbing both victims, and specifically identified seeing a "glimmer" as Appellant made a stabbing motion. Boykin obviously had a motive to implicate Appellant, and the jury received the corrupt and polluted source instruction. That is a credibility determination that was properly for the jury to make. In any event, Boykin's testimony is supported by other evidence circumstantially connecting Appellant to the stabbings. First, Reese, who had the best opportunity to observe Boykin's actions, was adamant that Boykin never fought Pickett. Reese was presented with his prior testimony given at Boykin's preliminary hearing, wherein he stated that Boykin never fought Pickett. N.T., 2/24/20, at 155-56. He also stated at the preliminary hearing that he never saw Boykin with a knife and that Boykin had him in a headlock throughout. *Id.* at 155. Second, Appellant fled the scene and sought treatment at Abington Hospital, and had a hand injury consistent with a knife.

We add that the trial court, which observed the lengthy proceedings and had a firsthand view of the video surveillance, wrote in its opinion that the video shows all actors except Appellant and Pickett:

> The security video shows Ms. Allen coming out of the building and Eric Reese going over to her to escort her to her vehicle. Words are exchanged between the two groups. Some pushing and shoving leads to swinging and fighting. Pierce Boykin swings at Pickett and misses, and then Eric Reese punches Boykin.
>
> Fighting goes on until they realize [Pickett] has been stabbed and has fallen to the ground and is dying. The video accounts for everyone during the altercation except the decedent and [Appellant], who are out of frame. The video then shows Reese on top of Boykin when [Appellant] comes over to get Reese off his friend. Reese [is] stabbed and [A]ppellant then runs off and jumps in his car and drives off.

Trial Court Opinion ("TCO"), 12/10/21, at 3-4.

Given the short timeframe involved, the fact that Appellant and Pickett are off camera supplies circumstantial evidence that Appellant was the only person realistically capable of stabbing Pickett. Taken together, the evidence supports a rational inference that Appellant stabbed both Pickett and Reese. This is not one of the rare situations in which the verdict must have been the product of pure conjecture.

Appellant's second claim challenges the weight of the evidence. This claim is simply a repackaging of the first claim, as demonstrated by Appellant's argument in support. "The same arguments set forth above, in Appellant's sufficiency claim, are raised here and incorporated in his weight claim." Appellant's Brief at 30-31. Thus, our rejection of the foregoing claim effectively resolves this claim as well.

- 11 -

A motion for new trial on the grounds that the verdict is contrary to the weight of the evidence, concedes that there is sufficient evidence to sustain the verdict. Thus, the trial court is under no obligation to view the evidence in the light most favorable to the verdict winner. An allegation that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. A trial judge must do more than reassess the credibility of the witnesses and allege that he would not have assented to the verdict if he were a juror. Trial judges, in reviewing a claim that the verdict is against the weight of the evidence do not sit as the thirteenth juror. Rather, the role of the trial judge is to determine that "notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice."

*Commonwealth v. Widmer*, 744 A.2d 745, 751–52 (Pa. 2000) (footnote and citations omitted). On appeal, our review is "distinct from the standard of review applied by the trial court[.]" *Commonwealth v. Clay*, 64 A.3d 1049, 1055 (Pa. 2013). We do not review the underlying weight of the evidence question. Instead, we examine the judge's exercise of discretion in ruling on that claim. *Id.* The trial court determined that the verdict did not shock its conscience, and the analysis set forth above applies here. We find no abuse of discretion.

In his third issue, Appellant argues that the trial court erroneously permitted the Commonwealth to read in the testimony of Pierce Boykin from the mistrial. Former testimony is an exception to the rule against hearsay, provided that the declarant is unavailable. Pa.R.E. 804(b)(1). The Rules of Evidence state the qualifying conditions for deeming a witness as unavailable. Pa.R.E. 804(a). The provision applicable in this case states that a witness is

unavailable if the declarant "is absent from the trial or hearing and the statement's proponent has not been able, by process or other reasonable means, to procure … the declarant's attendance, in the case of a hearsay exception under Rule 804(b)(1)[.]"  Pa.R.E. 804(a)(5)(A).  There is a constitutional component at issue as well, as Boykin's statements are clearly testimonial.  *Crawford v. Washington*, 541 U.S. 36, 68 (2004) ("Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations.").  Thus, the Commonwealth was required to establish that Boykin was unavailable.  *Id.* ("Where testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination.").  In *Commonwealth v. Melson*, 637 A.2d 633 (Pa. Super. 1994), this Court explained the principles applicable to this type of claim:

> The test for availability under the Sixth Amendment is broad: a witness is unavailable if the prosecution has made a good faith effort to introduce its evidence through the live testimony of the witness and, through no fault of its own, is prevented from doing so.  *Ohio v. Roberts*, [448 U.S. 56, 74 (1980)] (the "ultimate question is whether the witness is unavailable despite good-faith efforts undertaken prior to trial to locate and present that witness")[.]

*Id.* at 637.  "The length to which the prosecution must go to produce the testimony is a question of reasonableness."  *Id.* at 638.

The facts surrounding the Commonwealth's efforts to present Boykin were established at two points during the trial.  First, on February 19, 2020,

- 13 -

one day before trial was set to begin, the trial court stated that the Commonwealth filed a motion, apparently informally as it was not docketed, seeking the admission of Boykin's testimony. The Commonwealth stated that it wanted a ruling for purposes of what information it could discuss in opening statements. Appellant objected, citing the right to confront his accusers and the right to a fair trial. N.T., 2/19/20, at 4. Appellant argued that Boykin was not unavailable as contemplated by the law. The Commonwealth acknowledged that it "must prove that … a good-faith effort was made on the part of the prosecution to produce the witness[.]" *Id.* at 8. The Commonwealth represented that "several detectives" as well as the assistant district attorneys prosecuting the case "over the course of the last two months" had attempted to find Boykin. *Id.* at 8-9. Boykin's attorney "made abundantly clear to the Commonwealth that he was not going to be cooperating with the Commonwealth's case this time around." *Id.* at 9.

> That was the very first statement that he made through that attorney, and he continued to make that through the attorney. He continued to tell that to his probation officer, who is, again, an officer of the court, over, over, and over, that he was not going to. The probation officer told him he would be in violation. Indeed, this Court on this case … in the past two weeks has issued a material witness petition, with some of that same information, understanding that Mr. Boykin was purposefully absenting himself from this proceeding and refusing to cooperate.

*Id.* at 9-10. The Commonwealth also stated that it would "continue to" try to locate Boykin. *Id.* at 11. The trial court granted the motion, permitting the Commonwealth to mention Boykin's testimony in its opening.

On February 24, 2020, the parties discussed some potential jury instructions, including instructions as to why Boykin was absent. The court stated, "Boykin is not showing because why? I'm not privy to that." N.T., 2/24/20, at 7. The Commonwealth stated, "[A]t some point, we will put detectives up to talk about their efforts in trying to find him…. There has to be some testimony unless there's some stipulation by you, and we can read that into the record." *Id.* at 8. Appellant agreed to stipulate, and the trial court instructed the parties to work out a stipulation. *Id.* Boykin's prior testimony was then read into the record on February 26, 2020. Immediately following that testimony, Appellant informed the court that the parties "worked out a stipulation with regard to Mr. Boykin." N.T., 2/26/20, at 83. The Commonwealth then read the following to the jury:

> Ladies and gentlemen, there's been a stipulation by and between counsel that Pierce Boykin cannot be located. Despite numerous attempts by Homicide Detectives Graf, Morton, Scally, and Livewell, Boykin has not been located at this time.
>
> Mr. Boykin's probation officer Mark Firm (ph) has given the Commonwealth his address. Mr. Firm also told Mr. Boykin about the court date and to honor the subpoena. Probation Officer Firm has also spoken to Boykin's father, who he lives with, about the court date and subpoena.
>
> Detective Morton has personally gone to the listed property for Mr. Boykin several times, day and night, and has not found Mr. Boykin. He has left subpoenas at that residence.
>
> Counsel for the D.A.'s Office has called Mr. Boykin numerous times regarding the subpoenas and trial dates. Counsel for the D.A.'s Office has also informed Mr. Boykin's personal attorney about the subpoena and trial date.

Detective Morton has also checked all area hospitals and morgues for Mr. Boykin, with negative results.

*Id.* at 84-85.

As a prefatory matter, Appellant argues that the trial court erred because the Commonwealth failed to present any evidence. "No testimony was taken by the [t]rial [c]ourt as to Boykin's whereabouts." Appellant's Brief at 32. The Commonwealth bore the burden of establishing that Boykin was unavailable. *Ohio v. Roberts*, 448 U.S. 56, 74-75 ("The ultimate question is whether the witness is unavailable despite good-faith efforts undertaken prior to trial to locate and present that witness. As with other evidentiary proponents, the prosecution bears the burden of establishing this predicate.").

However, Appellant stipulated to the testimony that would have been presented. While this stipulation was prepared after the trial court had already granted the motion and was read into the record after Boykin testified, in context we discern no error in permitting the stipulation to be entered at that time. The Commonwealth sought an anticipatory ruling before opening statements out of an abundance of caution, anticipating that Boykin would not appear. The Commonwealth noted that it would continue to try and locate Boykin in the interim, and his testimony was read into the record one week later. When Boykin failed to appear, the parties agreed on a stipulation.

Of course, the fact that Appellant stipulated to the testimony does not equate to a stipulation that those efforts satisfied the applicable legal standard. The remaining question is thus whether the trial court abused its discretion in determining that these efforts established that Boykin was

unavailable in the constitutional sense.[2]  In resolving this claim, we note that the Commonwealth is not required to take every potential measure.  In ***Commonwealth v. Douglas***, 737 A.2d 1188 (Pa. 1999), the appellant asserted that the police should have established video surveillance inside the housing project where the witness lived.  The ***Douglas*** Court determined that the trial court did not abuse its discretion in finding that the Commonwealth made a good faith effort to locate a witness despite the lack of surveillance.  Police officers took several measures, including

> repeatedly searching at his apartment, at his mother's apartment, at a number of bars he was known to frequent, at his girlfriend's house, and elsewhere.  The police also contacted McLaurin's mother, his sister, his girlfriend, his neighbors, the security officers at the housing project, and others to try to find McLaurin, all to no avail.  Notwithstanding the lack of surveillance at the housing project, we cannot conclude that the trial court abused its discretion in finding that the Commonwealth made a good faith effort to locate McLaurin.

***Id.*** at 1195–96.

 ***Douglas*** cited ***Commonwealth v. Wayne***, 720 A.2d 456 (Pa. 1998), which rejected a claim similar to Appellant's present contention that the Commonwealth did not act reasonably because it had advance knowledge that Boykin did not intend to appear.  The appellant in ***Wayne*** did not claim that the efforts undertaken were not thorough in themselves, but that those

---

[2] We note that the trial court did not make any explicit findings concerning whether these efforts qualified as a good faith effort under the circumstances, concluding only that "Mr. Boykin was unavailable."  TCO at 15.  The Commonwealth cited the correct principles of law when arguing the motion, and we therefore conclude that the trial court made the required finding.

"efforts should have begun more than four days prior to … trial. [Wayne] argues that the Commonwealth knew that [the witness] might not be available, thus they were under an obligation to act with greater tenacity in securing his presence." *Id.* at 467. The Court disagreed. "The Commonwealth is held to making a reasonable effort to secure the witness's presence, not to being omniscient regarding the potential for a witness to leave the jurisdiction." *Id.* In *Commonwealth v. Blair*, 331 A.2d 213 (Pa. 1975), cited with approval by *Wayne*, the Supreme Court of Pennsylvania stated that the Commonwealth need not "establish that the witness has disappeared from the face of the earth; it demands that the Commonwealth make a good-faith effort to locate the witness and fail." *Id.* at 215.

Appellant directs our attention to *McCandless v. Vaughn*, 172 F.3d 255 (3d Cir. 1999), a decision granting habeas relief based on the Commonwealth's failure to establish that a witness was unavailable.[3] In that case, police found a victim who had been killed by gunfire. An eyewitness told police that he had heard gunshots coming from a garage rented by McCandless. The witness had seen the victim crash through a garage door. He then saw a man, later identified as John Barth, running from the garage, then returning to help another man remove a collapsed garage door from a

---

[3] *McCandless* involves an application that was filed prior to the 1996 amendments to the federal habeas corpus statute. After the 1996 amendments, a federal court cannot grant relief unless the state decision "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

Chevrolet. That other man then fled the scene in the Chevrolet, and McCandless owned a Chevrolet like the one observed by the witness.

Police arrested Barth for murder. Barth then implicated McCandless and another man. Prosecutors agreed to "(i) facilitate his release on bail, and (ii) at the successful conclusion of the case, drop the charges against him" if Barth cooperated and his information could be corroborated. *Id.* at 259. At a preliminary hearing, Barth testified that McCandless shot the victim. After the hearing, Barth disappeared and did not appear at trial. The Commonwealth was permitted to read in Barth's preliminary hearing testimony. The Superior Court concluded that the Commonwealth sufficiently established that Barth was unavailable.

A panel for the Third Circuit of the United States Court of Appeals reversed, concluding that the Commonwealth failed to establish that Barth was constitutionally unavailable. The ***McCandless*** Court stated that the reasonableness of the Commonwealth's efforts "must be evaluated with a sensitivity to the surrounding circumstances and the defendant's interest in confronting the absent witness." *Id.* at 266. "McCandless's interest in confrontation with Barth could not have been higher." *Id.* The prosecution sought the death penalty, and Barth was the only eyewitness to the shooting and provided the only substantial evidence implicating McCandless. Nor was Barth an impartial witness, as he had been charged with murder and agreed to testify in exchange for his release and later dismissal of charges.

The panel then addressed the Commonwealth's efforts to secure Barth's presence at trial. A detective "testified that he told other police officers to keep an eye out for Barth and that he personally looked for him when he was in Barth's neighborhood 'on other business.'" *Id.* at 267. But "he made no effort to locate Barth during the two months prior to … trial." *Id.* Another detective "slipped a subpoena under the door" of Barth's house, and questioned a grocer and a neighborhood youth regarding Barth's whereabouts. Less than a week before trial, that detective spoke with a neighbor who said that Barth's wife was at the shore. Nobody sought to contact Barth's father, mother, or siblings. A third detective visited the Barth residence one week before trial. Barth's wife and "a man he assumed to be Barth's brother" said they had no knowledge of Barth's whereabouts. *Id*. Additional testimony from a representative of the pretrial services unit discussed their efforts to locate Barth. The *McCandless* Court summarized the efforts as follows:

> The government supported a bail reduction that allowed Barth to gain his freedom. After two failures to appear, two bench warrants and two rearrests, it sought no alteration in conditions of his bail. In early May of 1982, three months before trial, Barth failed to appear for the third time and a bench warrant was issued. Follow-up calls by Barth's pre-trial services officers established that Barth could not be expected to voluntarily cooperate. As of mid-May, two and a half months prior to trial, it is fair to say that Barth's presence at trial would not be assured unless the prosecution took affirmative action to secure it. Its response to this situation over the next ten weeks can only be described as casual.

*Id.* at 268. The **McCandless** Court made a legal finding that, in effect, determined the Commonwealth acted in bad faith:

> Given Barth's crucial role in the prosecution's case, we are left with the firm conviction that the prosecution's efforts to assure Barth's presence would have been far less casual had the shoe been on the other foot. If the prosecution had not had Barth's preliminary hearing testimony and had needed Barth's presence at trial, we are confident that the resources and effort devoted to finding him prior to trial would have been greater than they in fact were.

*Id.* at 267.

We decline to make the same type of bad faith finding here. **McCandless** is not binding on this Court, **Martin v. Hale Prod., Inc.**, 699 A.2d 1283, 1287 (Pa. Super. 1997), and the case merely represents a holding that the necessarily fact-intensive inquiry of what is reasonable under the circumstances was not met in that case. **See also United States v. Smith**, 928 F.3d 1215, 1228 (11th Cir. 2019) (finding that the government made a good-faith, reasonable effort to obtain witness; "we do know from the Supreme Court that there is no brightline rule for reasonableness, and that a reasonableness inquiry necessarily is fact-specific and examines the totality of the factual circumstances of each particular case."). The Commonwealth's efforts here were not as deficient as in **McCandless**, where the prosecution apparently never informed Barth of the trial date. Here, in contrast, Boykin was apparently aware of his obligation to appear. The Commonwealth admittedly could have offered more detail regarding what efforts its detectives took to find Barth during the trial; the stipulation's recitation that four

detectives made "numerous attempts" to locate Boykin tells us next-to-nothing. However, the stipulation states that Boykin's probation officer spoke to Boykin's father, who lived with Boykin, and informed him of the court date and subpoena. A detective personally visited Boykin's listed property several times, and informed Boykin's attorney of the trial date and subpoenas. A material witness warrant was issued shortly before trial. The Commonwealth did not act as casually as the prosecutors in **McCandless**.

Appellant posits that the latter point cuts both ways, in that the Commonwealth admitted that it knew well in advance of trial that Boykin did not intend to appear. We agree that this is pertinent. **See McCandless**, 172 F.3d at 268 ("[C]alls by Barth's pre-trial services officers established that Barth could not be expected to voluntarily cooperate. As of mid-May, two and a half months prior to trial, it is fair to say that Barth's presence at trial would not be assured unless the prosecution took affirmative action to secure it."). But Appellant does not argue that the Commonwealth was mandated to jail Boykin. In this regard, we note that Rule of Criminal Procedure 522 permits the detention of witnesses, including material witnesses. The Comment indicates that "a witness may be released on his or her own recognizance conditioned upon the witness' written agreement to appear as required." **Comment**, Pa.R.Crim.P. 522. In other words, Boykin's own liberty interests are relevant, and in the absence of focused arguments on this point, we are unprepared to hold that, as a matter of law, the Commonwealth was required to arrest Boykin at some undefined point in time prior to trial. The

Commonwealth made efforts to have Boykin appear at trial, Boykin appeared to have been made aware of the subpoena, and the stipulation indicates that officers attempted to execute the material arrest warrant. *Cf. Hardy v. Cross*, 565 U.S. 65, 71 (2011) ("We have never held that the prosecution must have issued a subpoena if it wishes to prove that a witness who goes into hiding is unavailable for Confrontation Clause purposes[.]"). The trial court did not conclude that the Commonwealth acted in bad faith and the concomitant legal conclusion that Boykin was unavailable is supported by the record.

Appellant's fourth claim concerns the fact that one of the jurors admitted to independently examining the weather conditions for the evening of the murder. On the morning of February 28, 2020, the court officer found notebooks belonging to two separate jurors. N.T., 2/28/20, at 4. The court examined the material and then brought in both jurors to confirm that the material was "only a recap of what they heard[.]" *Id.* at 5. The first juror confirmed that the notebook was just a summary and denied conducting any other research. *Id.* The second juror also confirmed that the notebook contained a summary of witness testimony. *Id*. at 9. The court asked if the juror did "any research … that would involve anything other than the testimony you heard in this courtroom." *Id.* The juror responded, "I looked at the weather." *Id.* Specifically, the juror "looked at the high and the low temperature that day." *Id.* The juror confirmed that this research did not have any bearing on their ability to assess the evidence presented and agreed

to decide the case based only on the evidence presented. *Id.* at 10. The attorneys declined the court's opportunity to ask any follow-up questions. *Id.* Appellant then made a motion for mistrial. The judge denied the request based on the juror's answers and the fact that the independent research was limited to "the weather conditions on the day in which the event occurred." *Id.* at 11.

Appellant contends that "prejudice must be presumed" when a juror conducts independent research. He cites three cases involving removal of jurors: *Commonwealth v. Marrero*, 217 A.3d 888 (Pa. Super. 2019); *Commonwealth v. Rush*, 162 A.3d 530 (Pa. Super. 2017); and *Commonwealth v. Smith*, 206 A.3d 551 (Pa. Super. 2019). These cases are inapposite.

In *Marrero*, a juror informed the trial court that another juror made remarks concerning "the concept of facing trial before 'a jury of your peers,'" with the juror saying that "none of us are [*sic*] his peers." *Marrero*, 217 A.3d at 889 (bracketing in original). The reporting juror construed this as "possibly referring to [a]ppellant's Latino heritage." *Id.* The trial court questioned the juror, who explained that the comment referenced the disparity in age. *Id.* at 890. The court deemed the juror's explanation credible and declined to discharge the juror, and this Court found no abuse of discretion.

In *Rush*, the appellant was charged with, *inter alia*, torture of a police dog, for stabbing a police dog that later died due to the wound. The canine's handler cried during the playback of a 911 call, which included his police dog

barking in the background. One of the jurors began crying as well. During a break, the appellant asked that the juror be removed on the basis that her crying "causes me to question whether she can decide this case impartially[.]" *Rush*, 162 A.3d at 539. The trial judge declined, explaining that it was not clear why the juror cried. "I … cry at weddings and funerals of people I don't know, because I respond to other people's sorrow. So the fact that the officer cried on the stand may have triggered that[;] we don't know." *Id.* The court stated that "the law presumes that the jury will be able to follow the instructions given," and the judge stated that the closing instructions will remind the jurors to decide "based on the evidence" and not due to emotional considerations. *Id.* This Court found no abuse of discretion by the trial judge, noting that appellant "did not ask that the juror be questioned," and "offered nothing more than speculation about [the juror]'s possible bias or influence on the rest of the jury." *Id.* Accordingly, the appellant failed to "meet his burden to show that the jury was not impartial." *Id.*

The *Marrero* and *Rush* cases both involve whether the trial court abused its discretion in declining to discharge a juror prior to the jury entering its verdict, whereas here the question is whether Appellant was entitled to a mistrial. Appellant has not cited any case involving a mistrial as opposed to seeking the juror's removal. The cases are therefore of little help to Appellant in that both suggest that a request for removal was the appropriate remedy. Moreover, similar to the appellant's failure in *Rush* to ask the court to question the juror, Appellant did not ask the juror what bearing her research had on

her view of the case, if any, and it is unknown whether the juror shared the information with her fellow jurors. Nor did the juror indicate whether this piece of information contradicted anything presented at trial. Thus, neither case is helpful.[4]

The Commonwealth's citation to ***Commonwealth v. Szakal***, 50 A.3d 210 (Pa. Super. 2012), is closer to the mark as it involved a post-sentence motion for a new trial based on alleged juror impartiality. There, the juror informed the appellant's counsel that he felt coerced into finding the appellant guilty of second degree homicide and stated that during deliberations "he asked his daughter to locate jury instructions for first, second and third degree murder on the internet and read them to him." ***Id.*** at 223. The ***Szakal*** Court explained that jurors are generally barred from testifying about what happened during deliberations, but there is an exception for "testimony of extraneous influences which might have affected (prejudiced) the jury during their deliberations." ***Id.*** (quoting ***Commonwealth v. Messersmith,*** 860 A.2d 1078, 1085 (Pa. Super. 2004)). "Extraneous influence" is defined by information "not provided in open court or vocalized by the trial court via instructions." ***Id***. In the case of a "potentially prejudicial extraneous

_____

[4] The ***Smith*** case involved the trial court granting the Commonwealth's motion to discharge a juror during trial, based on its discovery that the juror had previously been adjudicated delinquent of indecent assault, which was the crime at issue in ***Smith***. The panel concluded that the trial court did not abuse its discretion in discharging the juror. It is unclear what relief would have been available if the panel had determined that the court erred.

influence," then a three-prong test is applied to determine if there was a "reasonable likelihood of prejudice[.]" *Id.*

*Szakal* is arguably of minimal value as it too does not suggest that mistrial is a proper remedy. Appellant acknowledges that the cases he cites are not on point but suggests that his case presents an even stronger basis for relief because the juror admitted to violating the court's prior orders not to conduct independent research. Putting aside the fact that it is unknown whether the juror shared the information she learned with the other jurors, as Appellant declined to ask any questions of the juror when given the opportunity, Appellant offers no reason why, at minimum, he would not be required to show a reasonable likelihood of prejudice as in *Szakal*. Instead, he merely argues that "prejudice must be presumed." Appellant's Brief at 41. We disagree. The three-prong *Messersmith* test quoted by *Szakal* states that judges should consider whether the information "merely involves a collateral issue," whether it involved information "they did not have before them at trial," and whether the information "was emotional or inflammatory in nature." *Messersmith*, 860 A.2d at 1085. As the Commonwealth states, Appellant "does not even try to explain why the juror's curiosity about the weather denied him of his right to a fair and impartial jury." Commonwealth's Brief at 19. Even if we accept that a mistrial could be granted under these circumstances in lieu of discharging the juror, the fact remains that Appellant's rule would require judges to grant mistrials as a *per se* remedy. We fail to

see why courts should be required to take that drastic step even when the information learned, as here, appears to be largely inconsequential.

Appellant's final issue concerns the trial court's use of technology to permit the parties to remotely participate in Appellant's sentencing proceeding. The COVID-19 pandemic suspended rules generally barring the use of technology to conduct remote proceedings, *see* Pa.R.Crim.P. 119, and the trial court permitted parties to participate via Zoom. The trial court's opinion states that it believed each side would gather their respective participants in a conference room, as Appellant did. The Commonwealth, however, distributed the Zoom link to individual persons. One of those recipients then distributed the link to others, and the sentencing proceeding was broadcast to other social media sites. This led to unknown participants using the chat functionality to offer comments during sentencing. TCO at 23.

The trial court took responsibility for the mishap. "Clearly, the court erred in failing to adequately restrain individuals from obtaining the [Z]oom link and give others access to the proceedings." *Id.* at 25. Simultaneously, the court made clear that it did not see the comments posted to the chat room, let alone consider them. "This court was not connected to the chat, but when it was brought to our attention that individuals were acting improperly, all were ordered to stop any messaging." *Id.* at 23.

Appellant contends that the trial court must have considered the comments. "Most importantly, the [c]ourt must have been impacted, not only by the large number of individuals who were present, unknown and

unidentified, but by the comments which were made by unknown individuals during the hearing." Appellant's Brief at 43. We agree with the Commonwealth that this claim challenges the discretionary aspects of his sentence. Those appeals are not as of right.

> When challenging the discretionary aspects of the sentence imposed, an appellant must present a substantial question as to the appropriateness of the sentence. Two requirements must be met before we will review this challenge on its merits. First, an appellant must set forth in his brief a concise statement of the reasons relied upon for allowance of appeal with respect to the discretionary aspects of a sentence. Second, the appellant must show that there is a substantial question that the sentence imposed is not appropriate under the Sentencing Code. That is, the sentence violates either a specific provision of the sentencing scheme set forth in the Sentencing Code or a particular fundamental norm underlying the sentencing process. We examine an appellant's [Pa.R.A.P.] 2119(f) statement to determine whether a substantial question exists. Our inquiry must focus on the *reasons* for which the appeal is sought, in contrast to the *facts* underlying the appeal, which are necessary only to decide the appeal on the merits.

*Commonwealth v. Christman,* 225 A.3d 1104, 1107 (Pa. Super. 2019) (quoting *Commonwealth v. Rhoades*, 8 A.3d 912, 915 (Pa. Super. 2010)).

Appellant does not include the required separate statement, but the Commonwealth has not raised an objection. Thus, we may overlook it. "[I]n the absence of any objection from the Commonwealth, we are empowered to review claims that otherwise fail to comply with Rule 2119(f)." *Commonwealth v. Bonds*, 890 A.2d 414, 418 (Pa. Super. 2005). Turning to the substantial question component, Appellant's allegation that the trial court must have considered the comments presents a substantial question.

*See Commonwealth v. King*, 182 A.3d 449, 454 (Pa. Super. 2018) (finding a substantial question where the appellant asserted that the court erred in considering impact victim testimony by the victim's wife).

However, Appellant's claim fails because the trial court explicitly states that it did not consider the comments and, in fact, did not even read their contents. TCO at 25. Appellant's claim that the trial court "must have" considered the facts because it imposed the statutory maximum for homicide in the third degree is not a convincing argument. It cannot be the case that imposing the statutory maximum acts as a *prima facie* demonstration that the trial court must have considered improper material.

To the extent that Appellant's claim can be construed as a challenge to its legality, we note that Appellant's claim is the opposite of the more common scenario in which a criminal defendant argues that a court erred by unlawfully excluding the public. *See Commonwealth v. Jordan*, 212 A.3d 91 (Pa. Super. 2019) (holding that right to public trial was violated when trial court excluded family members during *voir dire*). These errors may be deemed structural and, if so, require a new proceeding even if the error had no discernible impact. *Id.* at 103 ("The violation of the right to a public trial constitutes a structural defect, a specific type of constitutional error warranting a new trial without any showing of prejudice."); *see also Weaver v. Massachusetts*, --- U.S. ----, 137 S. Ct. 1899, 1910 (2017) ("The public-trial right also protects some interests that do not belong to the defendant.

After all, the right to an open courtroom protects the rights of the public at large, and the press, as well as the rights of the accused."). That concept recognizes that the outcome from a new proceeding may well be the same, but the values protected by opening the proceedings to the public are served by ensuring that the process is carried out in the open. Appellant's complaint that the proceeding was "too public" would not be remedied by a new, more restrictive sentencing proceeding. Whatever harms were caused by having the proceeding broadcast, the damage has already been done. Because the trial judge did not consider the comments of the public participants, there is no basis to order a new sentencing hearing.

Judgment of sentence affirmed.

*Judgment Entered.*

Joseph D. Seletyn, Esq.
*Prothonotary*

*Date: 2/23/2023*